Collins, Judge,
delivered the opinion of the court:
In this action, plaintiff seeks the refund of alleged over-payments of income tax for its fiscal years which ended September 30, 1955, and September 30, 1956, respectively. The total of the alleged overpayments (including interest) is $476,037.65.
Among plaintiff’s business activities were the publication and sale of the World Book Encyclopedia.[1] Marketing was accomplished by plaintiff’s vast sales organization which *79 relied upon personal solicitation. More than 80 percent of the purchases were made under the installment plan.
This case arises out of a dispute between plaintiff, an accrual-basis taxpayer, and the Commissioner of Internal Revenue over the proper year for the deduction of “quality bonuses,” a portion of the compensation paid to plaintiff’s sales managers. Effective October 1,1954 (the beginning of plaintiff’s 1955 fiscal year), plaintiff altered its system for compensating sales personnel. Previous to October 1, 1954, all of plaintiff’s sales force, managers as well as salesmen, were paid by means of commissions.[2] However, the revised system introduced a new element, the “quality bonus,” which managers[3] would receive in addition to specified commissions. There is no dispute as to plaintiff’s tax treatment of the commissions, but the basic issue in the present controversy is the proper time for deduction of quality bonuses.
Determination of quality bonuses was accomplished on the basis of 3-month periods. The size of the quality bonus which a particular manager would receive depended upon the number of approved orders taken in his territory which became “bona fide.” The test of “bonafication” was met if the purchaser accepted delivery and paid, within 6 months, an amount equal to the down payment plus two installment payments. Findings 17(b) and 23, infra. For each order which did not become bona fide, the manager’s account would be charged an amount equal to the sum of the commissions paid to the manager and to certain of his subordinates. Thus, depending upon the number of orders which failed to become bona fide, it was possible that the charges against a manager would exceed his potential quality-bonus credits.[4] For example, with regard to a district manager, his potential quality bonus for a certain edition of World Book was $3 per set. However, for each order which did not become bona fide, a charge in the amount of $36 would be made against *80 tlie manager’s account. For a detailed illustration of this system, see finding 27, infra.
With respect to each of the taxable years in issue, the amount of the quality bonus which plaintiff accrued on its books and included in its deduction for “salaries and wages” was determined in the following manner: First, plaintiff computed the total amount of potential quality bonuses which had been credited, during the year, to the accounts of the managers. Secondly, regarding the months which had ended at least 6 months prior to the close of the fiscal year, plaintiff could ascertain the exact amount of its liability for quality bonuses, since all sales made during those months either had or had not become bona fide. Thus, plaintiff knew the actual amount of charges made against the managers. Thirdly, with respect to the remaining months, it was not possible to determine plaintiff’s exact liability for quality bonuses. Therefore, plaintiff, on the basis of its past experience, estimated the number of orders accepted during the latter half of the year which would, in the future, fail to become bona fide. In this way, plaintiff made an estimate of the amount which would eventually be charged against the managers. Fourthly and finally, plaintiff subtracted from the total amount of potential quality-bonus credits (1) the actual charges against the managers for the first half of the year and (2) the estimate, relating to sales made in the second half, of future charges against the managers. The resulting amount was included as a deduction on plaintiff’s income tax returns. Finding 33, infra.
Basically, plaintiff’s contentions are that the deductions so determined for the respective years were proper and that plaintiff’s accounting method “clearly reflected” its income.[5] The Commissioner of Internal Revenue, on the other hand, disallowed plaintiff’s deductions in part, refusing to permit the deduction for quality bonuses attributable to orders taken during quality-bonus quarters which ended during the last 6 months of the fiscal year. Finding 52, infra. The position of the Government is that plaintiff’s liability for the quality bonuses was contingent until the “bonafication” period of 6 months had expired with respect to all. orders *81 accepted during the, quarter and that, so long as such liability remained contingent, no deduction for it was proper.
The test pertaining to the proper year for deductions by an accrual-basis taxpayer is contained in Treas. Eeg. § 1.461-1 (a) (2) and is as follows:
Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * (Emphasis supplied.)
Cf. United States v. Anderson, 269 U.S. 422 (1926). In the instant case, the Commissioner of Internal Eevenue properly concluded that, with respect to quality bonuses attributable to sales made during a given quarter, the “all events” test was not satisfied until a period of 6 months had elapsed after the end of the quarter.
Of prime significance are the terms of the contract entered into by plaintiff and each of its managers and the corresponding practice regarding quality bonuses. The pertinent contractual provisions, which are set forth in finding 17(b), infra, demonstrate the validity of defendant’s contention that a manager had no right to a quality bonus on an individual order. Eather, entitlement to a quality bonus depended upon the experience regarding all orders taken in the manager’s territory during a particular quarter. Upon the acceptance by plaintiff of an order, the manager received a “potential quality bonus credit.” However, the credit was potential in fact as well as in name, and the credit did not represent an actual liability of plaintiff.
According to the contract, a manager’s quality bonus was “based upon the number of accepted orders taken in * * * [his] territory which * * * [became] bona fide.” Before plaintiff’s obligation to pay a quality bonus came into being, it was essential to determine the number of sales which had met the test of “bonafication,” and no such determination could be made until the 6-month period had ended. As defendant points out, an integral part of the quality-bonus system was the provision that charges would be made against a manager’s account for each order which failed to become *82 bona fide.[6] The contract defined “the amount of quality bonus due * * * [a manager for a quarter] ” as the “excess of credits over charges * * As indicated previously, it was possible that a manager’s charges could be greater than his credits.
Plaintiff’s practice regarding quality bonuses was in accord with the provisions of the managerial contracts. Clearly, the basic feature of the quality-bonus system was the matter of “bonafication.” In the opinion of this court, the Commissioner of Internal Revenue properly concluded that plaintiff’s liability for quality bonuses for a given quarter was not fixed until the “bonafication” period of 6 months had elapsed.
Plaintiff asserts that the fixing of its liability for a quality bonus was not deferred, but took place upon the acceptance of the order. In support of its contention, plaintiff cites a number of cases, including Ohmer Register Co. v. Comm'r 131 F. 2d 682 (6th Cir. 1942) .[7] The compensation of Ohmer’s sales agents included a collection commission which was payable after Ohmer received the balance of the sales price from the customer. The Commissioner of Internal Revenue denied the right of Ohmer, an accrual-basis taxpayer, to deduct for 1936 a “reserve” representing liability for collection commissions attributable to the sales during that year. In holding that the deduction should be permitted, the court rejected the assertion that Ohmer’s liability was “contingent.” The court concluded that the commissions constituted a definite obligation at the time of shipment. Since Ohmer used the accrual method, the possibility “that the agent might not, in the end receive his full commission * * * [was] no *83 more material than that * * * [Ohmer] might not receive full payment * * *131 F. 2d at 686.
According to plaintiff, the quality bonuses are analagous to the commissions involved in Ohmer Register Co., supra, but we do not agree. One factual difference is that, in Ohmer, each individual order (upon shipment) gave rise to liability for a commission. With regard to the case at bar, we have already indicated that a quality bonus was based not upon an individual sale, but upon the overall experience within the manager’s territory for a given quarter. Secondly, in Ohmer and in plaintiff’s other authorities, the liability regarding which deductibility was sought had become fixed in the taxable year, and this was the basis for allowing the deduction in that year. E.g., Helvering v. Russian Fin. & Constr. Corp., 11 F. 2d 324, 321 (2d Cir. 1935). In other words, the “all events” test had been met, even though, in some instances, the liability was subject to a “condition subsequent” (for example, the possibility of default by the purchaser). Cf. Central Cuba Sugar Co. v. Comm’r, supra note 1, at 217.
With regard to the quality bonus, our decision is not limited to a holding that payment of the bonus was conditional upon satisfaction of the test of “bonafication.”[8] Instead, this court has concluded that no fixed liability on the part of plaintiff arose, regarding sales made in a particular quarter, until 6 months after the end of the quarter. In view of this conclusion, the notion that both sides of the ledger (i.e., income and expense) must be treated alike is not controlling. Plaintiff did accrue as income the full price of all sales made during the taxable year, subject to reduction in the amount of an addition to the reserve for bad debts. Findings 29 and 30, infra. However, because of the nature of the quality bonus, plaintiff’s accrual of the income is not determinative of the issue of the proper year for deducti-bility.
Subsection 446(a) of the Internal Revenue Code of 1954 provides that: “Taxable income shall be computed under the method of accounting on the basis of which the taxpayer *84 regularly computes his income in keeping his books.” However, one exception to the above general rule is as follows:
* * * if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary * * * does clearly reflect income. [§ 446(b).]
The manner in which plaintiff kept its books, including plaintiff’s treatment of quality bonuses, was in accord with accepted principles of accounting. Finding 56, infra. However, a similar finding was made in American Automobile Ass’n v. United States, 361 U.S. 687 (1961), and there the majority opinion pointed out that such a finding was not the same as a holding “that for income tax purposes it [the accounting method] so clearly reflects income as to be binding-on the Treasury.” 367 U.S. at 693.
In American Automobile Ass’n v. United States, supra, at 698, the majority of the Court upheld, as a proper exercise of discretion, the rejection by the Commissioner of Internal Revenue of the taxpayer’s accounting system.[9] Similarly, in the instant case, we view as the permissible exercise of discretion the Commissioner’s disallowance of the deductions and his treatment of the quality bonuses. When, as here, the liability for a certain expense is not fixed in the taxable year, the Commissioner need not permit the deduction of an amount representing an estimate of that liability. Cf. Brown v. Helvering, 291 U.S. 193, 201-03 (1934).[10]
*85 An alternative argument of defendant is that plaintiff had, without obtaining the consent of the Commissioner of Internal Revenue, made a change in its accounting for “compensation.” In view of our conclusion regarding the nature of the quality bonus, discussion of defendant’s alternative contention is unnecessary. However, mention must be given to the related assertion of plaintiff that the Government violated section 7605(h) of the Internal Revenue Code of 1954.[11] According to plaintiff, the inspection of plaintiff’s books for fiscal 1955 which Revenue Agent Mortenson made in 1958 was illegal, since it constituted a second examination regarding that year and it had been made without written notice from the Commissioner of Internal Revenue.
The factual circumstances regarding the examination of plaintiff’s records are set out in detail in findings 41-54, infra. We will assume, for the sake of argument, that Revenue Agent Mortenson’s activities amounted to an inspection of plaintiff’s books for fiscal 1955. The question, then, is what consequence should attach to the failure of the Commissioner of Internal Revenue to provide plaintiff with prior written notice.
Plaintiff cites Reineman v. United States, 301 F. 2d 267 (7th Cir. 1962), in which the court (1) determined that section 7605(b) had been violated and (2) held that, because of the impropriety of the second inspection, the resulting deficiency assessment was invalid.[12] In the opinion of this court, there is no warrant for extending the result reached in Reineman to the present case.
Previously, this court construed a provision identical to section 7605(b). Philip Mangone Co. v. United States, 73 Ct. Cl. 239, 54 F. 2d 168 (1931). The taxpayer in Mangone *86 allowed (under protest) the reinspection of its books for the year in question. After noting that the taxpayer should have refused access to its records until proper notice was given, this court stated: “Aside from all this, however, we can not hold that a deficiency assessment is illegal when the facts upon which it was based were ascertained in the way and manner proven.” 73 Ct. Cl. at 246. In addition, the opinion in Mangone quoted with approval the following language from J. 8. McDonnell, 6 B.T.A. 685, 691 (1927) :
* * * However, that section of the statute [§ 1005 of the Revenue Act of 1924] merely provides for the relief from unnecessary examinations of a taxpayer’s books and does not propose to provide that any deficiency resulting from such investigation shall be void. * * *
We consider the conclusion reached in Philip Mangone Co., supra, to be the proper one. The facts of the present case differ from those in Mangone, hut, in view of our interpretation of section 7605 (b), the outcome must be the same. As indicated above, the holding in Mangone was not limited to a determination that the taxpayer had waived its rights. Cf. concurring opinion in M. O. Rife, Jr., 41 T.C. 732, 751-2 (1964) ,[13] At the very least, Mangorae stands for the propo *87 sition that not every infraction of the notice requirement calls for nullification of the deficiency assessment.
Applying the rationale of Mangone to the present case, we hold that, despite the questionable nature of Revenue Agent Mortenson’s conduct (the secretiveness of her intent and purpose regarding the 1955 records), the deficiency assessment must stand. For a variety of reasons, some of which were the responsibility of plaintiff, Revenue Agent Harlor, the agent who first examined plaintiff’s 1955 records, did not- actually learn of the existence of the quality-bonus system. Findings 16(b) and 48-45, infra. On the other hand, Agent Mortenson’s use of plaintiff’s 1955 records was limited primarily to her inspection regarding the’quality bonuses. In this sense, it cannot be said that plaintiff was subjected to “unnecessary examination.” Furthermore, without regard to plaintiff’s subjective intent, plaintiff did voluntarily furnish to Agent Mortenson its 1955 records. Cf. M. O. Rife, Jr., supra, at 747.
Therefore, we conclude that, in this case, the failure of the Government to comply with section 7605(b) had no effect upon the validity of the deficiency assessment for fiscal 1955. As stated previously, we hold that the actions of the Commissioner of Internal Revenue with regard to plaintiff’s deduction of quality bonuses constituted the proper exercise of discretion. Accordingly, plaintiff is not entitled to recover and the petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff (hereinafter sometimes referred to as the “taxpayer”) , a Delaware corporation, has its principal place of business in Chicago, Illinois.
2. Throughout its existence, plaintiff has used the accrual method of accounting and has kept its books and filed its income tax returns on the basis of a fiscal year ending September 80. Plaintiff filed its federal income tax returns for the fiscal years ended September 30, 1955, and September 30, 1956, within the time required by law, with the Dis *88 trict Director of Internal Bevenue, Chicago, Illinois, and paid the taxes of $974,179 and $3,323,955, respectively, thereon shown to be due.
3. Prior to and during the fiscal years ended September 30, 1955, and September 30, 1956, plaintiff was engaged, among other business activities, in the publication and sale of the World Book Encyclopedia (hereinafter referred to as “World Book”), a 19-volume general encyclopedia, and “Childcraft,” a 15-volume set of books on child development. Plaintiff, through its Educational Division, published and sold World Book in three differently priced bindings (white, red, and blue) and Childcraft in two differently priced bindings (orange and blue).
4. During the 2 fiscal years (1955- and 1956) here in issue, plaintiff offered World Book and Childcraft for sale either for cash or under various installment purchase plans. Over 80 percent of the sales were made under installment purchase plans. Plaintiff charged somewhat lower prices for World Book and Childcraft to purchasers who paid cash than to purchasers who paid in installments. Whether a sale was at the cash sales price, or at the installment sales price, depended on whether the purchaser completed payment within 60 days following the date of the purchase order. Sales prices during this period were as follows:

5. Plaintiff’s sales of World Book and Childcraft were made primarily through personal solicitation by members of its nationwide sales organization which, during the period here involved, consisted of between 20,000 and 25,000 active salesmen, a large .portion of whom were employed on a part-time basis.
6. (a) During the 2-year (1955-56) period in issue, plaintiff maintained separate sales organizations for World Book *89 and Childcraft. Plaintiff generally divided its United States sales territory into geographical divisions and subdivided each division into regions, each region into districts, and each district into areas.
(b) Each of plaintiff’s divisions was headed by either a senior division manager or a division manager. Each region was headed by a regional manager. Each district was headed by a district manager and each area by an area manager. Under the supervision of an area manager were full-time and part-time salesmen (hereinafter sometimes referred to as “representatives”), who were further classed by grade.
(c) The above-described organizational structure was not fully established in every part of the country, as sometimes one or more of the managerial levels was omitted.
7. Approximately 1,000 members of plaintiff’s sales force were senior division managers, division managers, regional managers, or district managers. (Such sales personnel are hereinafter collectively called “managers,” and sales personnel below the level of district manager are hereinafter collectively called “salesmen.”) The duties of the managers were to hire salesmen, train, and supervise them.
8. Persons desiring to purchase World Book or Childcraft were required to execute and sign noncancelable purchase orders. Plaintiff, on receiving purchase orders in its principal office, checked them as to accuracy, terms, and credit standing, and accepted the order if satisfactory.
9. Although these purchase orders were by their express terms noncancelable, plaintiff, as a matter of actual practice, treated as a sales return (sometimes called a countermanded order) refusal by the purchaser to accept delivery of the books, notice of cancellation by the purchaser within 30 days following acceptance of the order, or return by the bank of the purchaser’s down payment check as uncollectible. In such cases, plaintiff attempted to find out why the order had been countermanded; and if the purchaser had a complaint and would not accept the books, plaintiff did not make a legal attempt to force acceptance.
10. (a) The lowest installment terms allowed by plaintiff for World Book were (i) prior to June 1,1953, a down payment of $10 and installment payments of $6 a month; (ii) *90 from June 1, 1953, through March SI, 1954, a down payment of $10 and installment payments of $10 a month; (iii) from April 1, 1954, through April 30, 1955, a down payment of $10 and installment payments of $6 a month for the red and blue binding, and a down payment of $10 and installment payments of $10 a month for the white binding; and beginning May 1, 1955, a down payment of $10 and installment payments of $6 a month for all bindings.
(b) The lowest installment terms allowed by plaintiff for Childcraft were a down payment of $5 and installment payments of $5 a month.
11.For the fiscal year ended September 30,1955, plaintiff sold 237,351 sets of World Book and Childcraft, resulting in net sales of $28,488,691. For the fiscal year ended September 30, 1956, plaintiff sold 283,638 sets of such publications, resulting in net sales of $35,343,880. Plaintiff’s outstanding installment receivables from purchasers of World Book and Childcraft, as of the close of each of the taxable years, 1953 to 1956, inclusive, were as follows:

12. Throughout the entire period, both prior to and during the 2 taxable years here in issue, plaintiff and its sales managers and salesmen had written contracts which described the relationship between them. With minor exceptions, the contracts were closely adhered to in the conduct of plaintiff’s business.
13. As of October 1, 1954, the contracts which had been in effect between plaintiff’s sales managers and salesmen (hereinafter called “old contracts”) were terminated, and plaintiff entered into new contracts with its sales personnel.
14. Under the old contracts, both managers and salesmen were compensated by means of commissions. Regarding each “bona fide” sale, the pertinent sales personnel were credited with their commissions. An order for an encyclo *91 pedia set became “bona fide” when the purchaser had accepted delivery and had paid, within 15 months of the order, the amount of $30. The old contracts provided that plaintiff would make certain advances against commissions.
15. The commission structure under the old contracts is illustrated by the following table showing commissions for a sale of World Book in the red binding made by the lowest level salesman under the supervision of an area manager, district manager, and senior division manager, and the advance on such commissions:

The senior division manager received, in addition to the amount set forth above, an office allowance of $1 on each bona fide order.
18. (a) Under the old contracts, plaintiff maintained for each taxable year a commission account for each manager and salesman. In brief, this account was charged with advances paid to the manager or salesman on sales made during the taxable year, and it was credited with commissions of such sales which became bona fide. After the end of the taxable year, plaintiff paid to the manager or salesman the excess, if any, of the credits to his commission account over the charges thereto.
(b) The accounting books of plaintiff and its federal income tax returns differed in the treatment which was accorded to plaintiff’s liability for commissions. In a document prepared by plaintiff and furnished to Revenue Agent Thomas B. Harlor, this difference in treatment was explained as follows:
In its Federal income tax return for the fiscal year ended September 30, 1955, the company reflected the amount of $2,751,188.00 in Schedule M, in which taxable income is reconciled to book income. This item, *92 representing a decrease from book income, was labeled “charges to accrued commissions in excess of provision.” A comprehensive explanation of this item has been requested.
Since inception, for book purposes, the company has consistently followed the practice of recognizing its expected liability to a sales representative as of the time the sales order taken by the representative was accepted in the home office. For tax purposes, however, recognizing that the commission might never actually become a liability because of a requirement that a certain amount of the sales price be collected before the commission would be credited and made unconditionally payable to the representative, the company has claimed deductions for commissions only as a definite liability to pay is incurred.
The company’s essential book accounting for commissions can be illustrated as follows:
Dr.: Commission expense
Cr.: Accrued commissions
(To record commission on acceptance of order.)
Dr.: Accrued commissions
Cr.: Commission payable (representative X)
(To record the earning of commission on sale and liability to pay to representative.)
As of the close of each taxable year, the company ascertained the amount by which the credits during the year to the accrued commission account (representing expected, but not actual liability) were greater or less than debits to the account (representing earned commissions becoming a legal liability). Income for tax purposes was increased in the years when credits exceeded the debits and decreased in years in which the debits exceeded the credits. The effect of this procedure was to limit deductions for sales commissions in each year to such amounts as were actually earned by and legally payable to the sales representatives.
Increases and decreases in income for tax purposes were as follows in recent years with respect to this item:
* Ü: * ¡J. *
For years after fiscal 1956 commission expense will be the same for book and tax purposes. The reason for this and for the large item in fiscal 1955 is discussed below.
For many years the aforementioned commissions on sales did not become legally enforceable obligations of the company until certain minimum portions of the sales price were received from the customer. For example, in the case of World Book Encyclopedia (red binding) the *93 commission of $24.00 was earned at sucli time as $30.00 of the total selling price of $129.00 was received by the company. The collection of $30.00 made the sale “bona fide” and such bonafication was essential to the representative’s entitlement to the commission.
Bonafication prior to the crediting of commissions was considered necessary in order to avoid the possibility that a commission of $24.00 would be credited and paid when the purchaser of the encyclopedia had paid a lesser amount as a down-payment and made no further payments. Experience over the years indicated that only about 10% of all accepted orders failed to become bona fide.
The maintenance of records to control the bonafication of orders was time-consuming and very costly. With the knowledge that about 90% of all orders became bona fide, the company determined that substantial clerical and administrative costs could be eliminated by dispensing with the requirement for bonafication. New contráete entered into during the fiscal year ended September 30, 1955 provide that commissions are due and payable at the time the sales orders are accepted. To compensate for the average loss of about 10%, the commission above mentioned was reduced from $24.00 to $22.00. As a consequence of the foregoing, there were charges to the accrued commission account during the fiscal year ended September 30,1955 aggregating $2,751,188.00, representing amounts which became payable during the year and deductible for tax purposes. There were no credits to the former accrued commission account, as in prior years, since current commissions became a liability at the date of sale. Taxable income accordingly was decreased in that amount in accordance with the established accounting methods. During the fiscal year ended September 30, 1956, charges to the account in the amount of $6,154.00, reflected in Schedule M of Form 1120 for that year, exhausted the balance in the account, and for subsequent years book and tax income are identical as respects this item.
17. (a) Under the terms of the new contracts, effective as of October 1, 1954, the compensation of plaintiff’s salesmen was treated differently from that of its managers. Salesmen were compensated exclusively by means of weekly commissions. Managers were compensated in part by means of weekly commissions. Salesmen were paid a commission contingent only on the acceptance of the order by the plaintiff.
*94 (b) The compensation of managers was divided into a commission, payable weekly, and a “quality bonus,” payable quarterly. The new contracts for managers provided, in part, as follows:
2. Compensation op Manager:
A. Commissions: (1) The Manager shall be paid weekly a commission on each order for immediate delivery which is taken in the territory assigned to him (including orders taken by him or by anyone in his sales organization) and is accepted by the Company. * * *
(2) The Manager shall be paid weekly an additional commission for each accepted parent or teacher order obtained personally by him and accompanied by cash in full or a substantial down payment. * * *
B. Commissions paid on countermanded orders shall be deducted from, and commissions payable on reinstated orders added to, commissions payable on other accepted orders. An order shall be considered countermanded if the subscriber refuses to accept delivery, or requests cancellation within 30 days from the date upon which the order is accepted at the Company’s home office, or if the subscriber’s check for the down payment is returned unpaid by his bank. A countermanded order shall be considered reinstated when the subscriber accepts delivery and subsequently makes at least his first monthly payment.
C. Quality Bonus: In addition to commissions, the Company shall pay the Manager a bonus, hereinafter called “quality bonus,” based upon the number of accepted orders taken in the Manager’s territory which become bona fide. An order becomes bona fide when the subscriber has accepted delivery and has paid the Company the following amount per set, or such other sum as the Company may from time to time specify, within six months from the date the order was accepted by the Company:
The Aristocrat_$30. 00
President Bed_ 22.00
Library Blue_ 22.00
[The amount specified in the Childcraft contracts for both of the bindings available for this set was $15.]
(1) The Company shall establish quality bonus periods, which shall run continuously and which shall be three months in duration, or such shorter time as the Company, at its option, may fix.
*95 (2) At tbe expiration of six months from the end of each quality bonus period, the Maitager shall receive the following quality bonus credit per set (based upon full selling prices now in effect) for each order which is taken in his territory during the bonus period and which has become bona fide, less quality bonus credits of any subordinate managers on such orders: [At this point the amount of the bonus credit was set forth.]
$ ‡ $
At the same time the MANAGER shall be charged with the following commissions and office allowances paid on orders which were accepted during the quality bonus period from his territory but which have not become bona fide:
(a) Commissions and office allowances paid to the Manager; and
(b) Commissions paid to all of the Manager’s subordinates, except district managers and their subordinates;
provided that the commission so charged against the Manager shall not include commissions previously recovered by the Company on unreinstated countermanded orders.
(3) The excess of credits over charges for a quality bonus period shall be the amount of quality bonus due the Manager for that period. In the event that the charges exceed the credits, such excess of charges shall be recovered from future quality bonuses due the Manager.
(4) If a subordinate manager has incurred an excess of charges over credits for a quality bonus period, such excess shall be deducted from the quality bonus due the Manager. When such excess of charges is recovered from future quality bonuses of the subordinate manager, the amount recovered shall be added to the quality bonus due the Manager.
(5) Payment of the quality bonus shall be made within eight months after the quality bonus period ends.
E. Except as otherwise provided in this agreement, all bonuses, advances on drawing account, or other remuneration, paid by the Company to anyone in the Manager’s organization, which are not deducted from amounts due a subordinate manager, shall be deducted from amounts due the Manager.
*96 4. Allowance pos Supplies, Advertising and Exhibits :
A supply account shall be established for the Manager and charged with the cost of all supplies furnished, advertising costs paid and exhibit expense paid by the Company on behalf of the Manager as follows:
[There followed an explanation of the meaning of “supplies,” etc.]
The Cost of all other items, not specified above, shall be paid by the Manager and shall not be charged against the supply account of the Manager.
As of the close of the contract year, the supply account of the Manager shall be credited with * * * [at this point was set forth a specified amount per set: $1.00 for a World Book, district manager] on total net accepted orders taken in the territory assigned to the Manager during the contract year. The total amount of such credit shall not exceed the total amount charged as specified above. In the event that the charges exceed the credits, the net charge remaining shall be recovered by the Company from quality bonus payments or other amounts due the Manager.
(c) The foregoing excerpts were taken from the branch office division manager’s agreement form for the sales of World Books. In all essentials (with the exception noted hereinafter), the contracts of all managers for both World Book and Childcraft were identical. However, it should be kept in mind that plaintiff employed “managers” who held different titles and were at varying levels. The charges made against a manager for orders which failed to become bona fide varied from level to level. A district manager was charged with commissions paid to him and to his subordinates. A regional manager was charged with commissions paid to him and to all of his subordinates. A senior division manager was charged with commissions and office allowances paid to him and commissions paid to all of his subordinates, except district managers and their subordinates.
18. The system of compensation under the new contracts is illustrated by the following table showing commissions for a sale of a World Book set (red binding) made by the lowest level of sales representative under the supervision of *97 an area manager, district manager, and senior division manager:

Sales level Compensation

Representative’s commission_$22.00
Area Manager’s commission_ 6.00
District Manager:
Basic commission_ 5. 00
Quality bonus_ 3.00
Senior Division Manager:
Basic commission_ 9.00
Quality bonus_ 4. 00
Total_ 49.00
19. Under the o’ld contracts the requirement that an order be bona'fide prior to the crediting of commissions had been considered necessary by the plaintiff in order to avoid the possibility that a commission of $24, or more, would be credited and paid when the purchaser of the encyclopedia had paid a lesser amount as a down payment and thereafter made no further payments. Plaintiff’s experience over the years prior to October 1, 1954, indicated that only about 10 percent of all accepted orders failed to become bona fide. Under the new contracts, in order to compensate for the average loss on orders which failed to become bona fide, commissions, although payable on acceptance of the order, were reduced by approximately 10 percent, and the compensation of managers was increased accordingly.
20. Although commissions were reduced under the new contracts, the total compensation of plaintiff’s sales force for each accepted order which became bona fide remained the same. The decrease in the amount of commission was offset by the introduction of quality bonuses for managers. Thus, the plaintiff’s total compensation of its sales force per bona fide order of the World Book (red binding) under both the old and the new contracts was $49.
21. Although the amounts and time periods differed, both the old and the new contracts contained essentially the same type of condition that had to be met with respect to payments by purchasers before orders became bona fide.
22. (a) Plaintiff treated an accepted order under the new contracts as bona fide if the purchaser paid the amount speci- *98 tied in the particular contract before the expiration of 6 months following the end of the month in which the order was accepted, which amount was equal to the down payment plus 2 monthly installments.
(b) While, under the standards established by plaintiff, it might take as long as 6 months following the end of the month in which a particular order was accepted to determine whether the order became bona fide, an order could become bona fide in less than a period of 6 months. Orders accompanied by a full cash payment became bona fide upon the date of acceptance. An installment order became bona fide upon payment by the purchaser of the first 2 monthly installments when due within 3% months following acceptance of the order), or at any subsequent time within (but not later than) 6 months following such acceptance.
23. Whether an order became bona fide depended solely upon the standards for “bonafication” being met, and not upon the fact that all payments ultimately were collected. E.g.. if a purchaser paid the exact amount specified in the contract at any time within the period required to make the order bona fide, but thereafter refused to make any further payments, the order remained bona fide. However, if a purchaser paid an amount less than that specified in the contract within the time required but thereafter paid in full for the publication, the order did not become bona fide.
24. The standards that plaintiff adopted and required to be met before an order became bona fide were based upon its collection experience. Plaintiff considered that a customer who paid on time the 2 monthly installments required to make a sales order bona fide was likely to be a good credit risk, and that one who failed to pay 2 monthly installments within the specified 6-month period was likely to be a poor credit risk.
25. (a) The changed system of compensation under the new contracts was the result of a study motivated primarily by plaintiff’s sales force.
(b) Plaintiff contends that it changed its system of compensation solely for the following reasons: (1) the old system was complex and confusing to salesmen, whereas the new *99 system was more acceptable to the salesmen; (2) the old commission system had been too complex to permit the introduction of mechanized accounting, whereas the new system permitted plaintiff to mechanize accounting for commissions; and (3) the new system was designed to secure better quality business by rewarding managers with quality bonuses for good business and penalizing them with charges for commissions and quality bonuses on poor business; thus, managers having the responsibility for the quality of credit sales had an incentive to employ good salesmen and to give them proper training and supervision. The evidence supports plaintiff’s contentions. However, the foregoing reasons were not the only ones which prompted plaintiff to change its system of compensation of its sales force.
(c) Considering all the facts of record, it appears reasonable to conclude that another reason which prompted plaintiff to change its system of compensation was the fact that by doing so tax savings would result from the accelerated deduct-ibility pf the commissions payable to plaintiff’s sales force.
26. To facilitate the administrative task of computing and paying quality bonuses, plaintiff divided its managers into three groups, each with a different set of quality bonus periods, which consisted of 3 months. The quality bonus quarters of Group A ended on January 31, April 30, July 31, and October 31; those of Group B ended on February 28 (or 29), May 31, August 31, and November 30; and those of Group C ended on March 31, June 30, September 30, and December 31.
27. (a) Plaintiff maintained the following 3-part set of payroll records for each of its managers for the purpose of computing the quality bonuses payable to them:
(1) A “Monthly Statement of Potential Quality Bonus Credits,” prepared at the end of each month, showing net orders[1] accepted during the month from each manager’s territory. This statement showed for each such order the amount of potential quality bonus to which the manager would be entitled should the order become bona fide.
*100 (2) A “Monthly Statement of Quality Bonus Charges,” which was based upon examination of net orders accepted in each calendar month and prepared after expiration of the succeeding 6-month period, to determine whether the orders had become bona fide, and which showed the number of orders that failed to become bona fide. For each such order which failed to become bona fide, this statement showed, inter alia, the amount of commissions and quality bonus to be charged to the manager.
(3) “Quarterly Statements,” in the form of ledger cards, covering each consecutive quarterly bonus period, on which the total monthly credits and total monthly charges shown on the above-described monthly statements for the quarter were entered in order to obtain the amount payable to the manager for the quarterly period.
(b) The effect of the credits and charges entered on the payroll records described above is illustrated in terms of a typical sale of a World Book in the red binding by the following : At the end of the month of acceptance of the order, plaintiff would have credited the district manager with his potential quality bonus of $3, and the senior division manager with his potential quality bonus of $4. At the end of the sixth succeeding month, if the sale had failed to become bona fide, plaintiff would have charged the district manager with $36 (representing the $3 quality bonus to which he was not entitled and the $33 of commissions paid to him and his subordinates on the order) ; and plaintiff would have charged the senior division manager with $13 (representing his commission and quality bonus). It is apparent from the foregoing that the charges to a manager’s quality bonus account, if an order failed to become bona fide, exceeded the amount of quality bonus which would have been credited to his account if the order had become bona fide.
28. Between 7 and 8 months following the ending of each manager’s quality bonus quarter, plaintiff paid to him the amount shown on his quarterly statement. If the charges against the manager shown on his quarterly statement exceeded his credits, no quality bonus payment was made to him. While he was not required to repay any deficit, plaintiff would offset the deficit against quality bonuses credited *101 to the manager during subsequent quarters. If a subordinate manager had a deficit for any quarter, plaintiff charged that deficit against the credits to his superior for the quarter, and, if the deficit exceeded the amount of such credits,- plaintiff would offset such excess against credits to the superior for future quarters. If plaintiff subsequently recovered such deficit from the subordinate manager for a future period, plaintiff then credited to the account of the superior the amount previously offset against his credits.
29. (a) Prior to and during the 2 taxable years ended September 30, 1955, and September 30, 1956, plaintiff, as of the date of acceptance of each order, accrued on its journal, and at the end of the month accrued in a ledger account, the full selling price of all sets of World Book and Childcraft for which it had accepted orders that month. In the case of sales returns, the accruals of commissions and quality bonuses were reversed. If a countermanded order was reinstated, the commission and quality bonus were again accrued.
(b) On its books for any given year, plaintiff accrued the full selling price of all sets of World Book and Child-craft for which it had accepted orders during that year, including sales made on the installment plan. Plaintiff also included as income on its federal income tax returns the total amount of all sales accrued on its books during the particular year.
30. Plaintiff used the reserve method of accounting for bad debts on its books of account for the taxable years ending September 30, 1955, and September 30, 1956, and for each prior taxable year. Plaintiff, both on its books and its federal income tax returns for such years, reduced the total amount of accrued sales by an addition to a reserve for bad debts. The addition was based upon plaintiff’s actual bad debt experience for the preceding 10 years. Plaintiff followed the same bad debt reserve method on its income tax returns for all such years.
31. Plaintiff did not establish a separate fund from which to pay the quality bonuses it would be obligated to pay on accepted orders that actually became bona fide. Plaintiff was under the accrual method of accounting, and, therefore, *102 it was not required to establish, a segregated fund in order to be entitled to deduct an accrued liability.
32. (a) On its books of account for the taxable years ended September 30, 1955, and September 30, 1956, and for each prior taxable year, plaintiff accrued the full amount of commissions (under both the old and the new contracts) on the net orders for World Book or Ghildcraft accepted by it during such taxable year. Plaintiff similarly accrued deductions for commissions under the new contracts on its income tax returns for the taxable years ended September 30, 1955, and September 30, 1956; however, for these years as well as for prior years, plaintiff deducted commissions under the old contracts in the year in which the sale to which the commission related became bona fide.
(b) There is a dispute between the parties as to whether the revision of plaintiff’s treatment of compensation constituted a “change of accounting method.” Begardless of the question of accounting semantics raised by the use of the word “change,” a chamge occurred with respect to the payment of commissions, and a change, occurred in the status accorded the commission figures entered in plaintiff’s journal on the date of the acceptance of an order and the commission figures entered on its ledger at the end of each month. Under the old contracts, the commissions on accepted orders were entered on plaintiff’s journal and ledger as credits to its accrued commissions account. This account represented “expected” liabilities that might or might not become legally enforceable obligations. Under the new contracts, commissions on an accepted order were entered as legally enforceable obligations to the sale representatives on the date of “sale.” While it is also true that plaintiff’s balance sheet, attached as Schedule L to its federal income tax return for the taxable year ended September 30,1956, showed a larger amount of accrued commission on September 30, 1956, than on September 30, 1955, this does not disprove plaintiff’s own statement (quoted in finding 16, supra) that “there were no credits to the former accrued commission account, as in prior years, since current commissions became a liability at the date of sale.”
(c) For fiscal 1955, plaintiff was able to deduct not only all of the accrued commissions (on orders accepted in prior *103 years), which commissions, under the old contracts, became payable in that year, but also the full commissions on all orders accepted during that year, which commissions were payable, under the new contracts, upon acceptance.
33. The amount of quality bonus accrued on plaintiff’s books and included in the deductions for “salaries and wages” in the taxable years ended September 30,1955, and September 30,1956, was determined by plaintiff as follows:
(a) First, plaintiff, as of the last day of the taxable year, determined the total amount of potential quality bonus which had been credited each month to the potential quality bonus accounts of all its managers.
(b) The exact amount of the plaintiff’s quality bonus liability to its managers for all months which ended at least 6 months prior to the end of the taxable year (hereinafter “closed months”) could be ascertained because all orders taken in such closed months either were or were not bona fide as of the end of the taxable year. Plaintiff subtracted the total amount of charges to its managers’ quality bonus accounts for the closed months from the total of all potential quality bonus for orders accepted during the year referred to in (a).
(c) For months which ended less than 6 months prior to the end of the taxable year (hereinafter “open months”), the exact amount of plaintiff’s liability to its managers for quality bonuses could not be ascertained because it would depend in part on future happenings, i.e., whether or not an order for which the “bonafication” period was open became bona fide. Therefore, plaintiff made an estimate of what it expected the charges to its managers’ quality bonus accounts would be on orders which would in the future fail to become bona fide and called such estimate “provision for future charges.” It subtracted this provision for future charges from the total potential quality bonus credit remaining after the subtraction of the known charges for the closed months described in (b) above and claimed the resulting total as a deduction for federal income tax purposes.
(d) Plaintiff computed the aforesaid provision for future charges at the end of the fiscal year 1955 by consistently using its experience over a basic period comprised of the *104 first 6 months of that year. Plaintiff computed the ratio for the 6 closed months of (1) the total charges to managers’ accounts to (2) the total potential quality bonuses credited to managers’ accounts. The resulting figure represented the percentage of potential quality bonus which had not become payable because of actual charges to managers’ accounts resulting from orders failing to become bona fide. Plaintiff assumed that the same percentage of chargebacks to total quality bonus would apply in the open months as had applied in the 6 preceding closed months. Then plaintiff multiplied the total potential quality bonus.credits for orders accepted in the last 6 months of fiscal 1955 by the percentage derived from its experience in the first 6 months. The resulting amount was plaintiff’s “provision for future charges.”
(e) Commencing with the month of October 1955, plaintiff computed a new percentage figure each month, changing •the former basé period by adding the experience of the most recent closed month and deleting the experience of the oldest month used in the prior base period. -Thus, .the base period used thereafter was always the most recent-6month period for which the “bonafication” period had expired. The following chart, prepared by.plaintiff-, sets forth the actual figures used by plaintiff in estimating the provision for future charges as of the end of its taxable years 1955-59 and shows that the percentage figure could and did vary during the indicated consecutive periods:
Percentages of (1) chargebaclcs of commissions, basic commissions, and quality bonuses to (2) total potential quality bonuses, used in computing estimates of expected chargebaclcs.

*105 34. Approximately 9614 percent of the sales for World Book and 94% percent of the sales for Childcraft made during the fiscal years ended September 30, 1955, and September 30,1956, became bona fide. While there is some evidence indicating that within any one year there was little change from month to month in the percentage of sales orders that became bona fide, it also is true that the cumulative effect of even a small decline in the percentage of orders that became bona fide during a particular year could result in a substantial change for that year. Even a relatively slight decline in the percentage of orders becoming bona fide would have caused a substantially magnified decline in plaintiff’s liability for quality bonus payments. For example, see finding 27 (b), supra.
35. Various factors not under the control of the plaintiff could affect the relative number of orders which would become bona fide. A sudden drop in collections would have reduced the amount payable to plaintiff’s managers, with respect to quality bonuses, below the amount shown by plaintiff as accrued on its books of account and oh its federal income tax returns.
36. At the end of each month, when plaintiff ascertained the abtual charges to managers’ quality bonus accounts for commissions and quality bonuses which had been credited on sales for the sixth preceding month but which had failed to become bona fide, plaintiff substituted such actual charges for the charges which had been estimated in the “provision for future charges” and adjusted its books of account accordingly. Similarly, after ascertaining, following the close of each taxable year, the actual charges for commissions and quality bonuses on sales for the last 6 months of such taxable year that had failed to become bona fide, plaintiff reflected in its income tax return for the succeeding year the difference between such actual charges and the provision for future charges previously calculated.
37. (a) The aggregate amounts of all quality bonuses, including potential quality bonuses, credited to managers on sales of World Book and Childcraft for the fiscal years ended September 30,1955, and September 30,1956, were $1,310,194 and $1,633,693.10, respectively. Plaintiff reduced the aggre *106 gate amount of quality bonus for each of those fiscal years (1) by the commissions and quality bonuses on sales which had failed to become bona fide and for which the “bonafication” period had expired and (2) by the provision for future charges with respect to net orders accepted during the second 6-month period in each of those years. Then plaintiff, at the end of the taxable years 1955 and 1956, accrued on its books and claimed as a deduction for quality bonuses the total sums of $998,023.43 and $1,138,499.25, respectively.
(b) At the end of each of the fiscal years, only a relatively small part of the accrued quality bonuses had actually been paid. The amount that remained unpaid at the end of each of the respective years was carried on plaintiff’s books under the caption “Accrued Commissions of Educational Division,” which included certain standard commissions and production bonuses. As of September 30, 1955, the amount of quality bonuses which had been accrued, but had not been paid, was $765,294.30; thus, as of that date, quality bonus payments totaling $232,729.13 ($998,023.43 less $765, 294.30) had been paid by plaintiff.
(c) With respect to the taxable year ended September 30, 1955, for which the plaintiff accrued $765,294.30 as its quality bonus liability for orders accepted during that year, the actual amount of quality bonus subsequently paid was $696,-727.37. With respect to the taxable year ended September 30, 1956, for which the plaintiff accrued $895,212.86 as its quality bonus liability for orders accepted during that year, the actual amount of quality bonus subsequently paid was $849,517.38. The difference between the amount charged as an accrued liability and the amount which was actually paid to the managers during each of the years 1955 and 1956 was credited to quality bonus expense in the following year.
38. Plaintiff did not refile its income tax returns for the taxable years ended September 30, 1955, and September 30, 1956, to show an adjustment for the difference between the amount accrued as a liability for quality bonuses and the amount actually paid to its managers. Plaintiff contends that accrual-basis taxpayers are required to base their income tax returns on accruals to the end of the taxable year, and that adjustments to accrued items occurring after the end *107 of the taxable year are required to be reflected in the latest taxable periods in which they occur.
39. On plaintiff’s federal income tax returns for the taxable years in issue, deductions for both commissions and quality bonuses were included under the general category “Salaries and Wages (not deducted elsewhere).” Such deductions, as to the Educational Division, for the fiscal year ended September 30,1955, included both deductions for commissions under the old contracts and deductions for commissions and quality bonuses under the new contracts. The deductions for fiscal 1955 totaled $14,867,640.77, of which sum the amount of $998,023.43 was for quality bonuses. Such deductions for the fiscal year ended September 30, 1956, totaled $14,738,614, of which sum the amount of $1,138,499.25 was for quality bonuses. Said income tax returns did not specifically refer to, or reflect the amount of, quality bonuses. While the returns (Form 1120) and instructions relating thereto asked for supporting schedules for various items, such schedules were not specifically requested with respect to deductions listed opposite Item 17, mentioned above.
40. As noted above, plaintiff’s deduction in Item 17 (Salaries and Wages * * *) on its federal income tax return for the taxable year ended September 30, 1955, included both deductions for commissions under the old contracts taken in the year in which the sale became bona fide and commissions and quality bonuses under the new contracts accrued in the year of acceptance of the order. Thus, on its income tax return for the taxable year ended September 30, 1955, plaintiff, for its Educational Division, showed a deduction of $2,751,187.74 as an adjustment to Schedule M for charges to accrued commissions in excess of provision. Said sum of $2,751,187.74 represents commissions under the old contracts which had not been deducted for the preceding tax year and which were deducted in plaintiff’s income tax return for the taxable year ended September 30, 1955, in accordance with plaintiff’s normal practice, which amount would have been deducted even if there had been no change in its contracts with its salesmen.
41. In March 1957, Internal Eevenue Agent Thomas B. Harlor audited plaintiff’s federal income tax return for *108 the taxable year ended September 30, 1955, and plaintiff made available to him all of its general books of accounts and records that he requested during the course of his examination. Agent Harlor had not previously audited plaintiff’s income tax return and was not familiar with plaintiff’s books and records.
42. Kevenue Agent Harlor did not check each item on plaintiff’s income tax return for the taxable year ended September 30,1955, because in his judgment it was not feasible to do so, due to the voluminous records maintained by plaintiff. Instead of making a complete examination, Agent Harlor selected certain items, either because of the large amount or the unusual nature thereof, which he considered required further examination or analysis. Agent Harlor usually requested plaintiff to furnish detailed analysis, vouchers, and canceled checks with respect to such items.
43. (a) In connection with his audit and examination of plaintiff’s federal income tax return for the taxable year ended September 30,1955, Agent Harlor investigated plaintiff’s deduction under Item 17 for salaries and wages of the Educational Division, amounting to a total of $14,867,640.77, including the “Schedule M” adjustment for charges to accrued commissions in excess of provision amounting to $2,751,187.74.
(b) Agent Harlor (as noted in finding 16(b), mpra) requested and received from plaintiff a written explanation of the above-mentioned “Schedule M” adjusted figure of $2,751,187.74. While such adjustment figure represents “charges to accrued commissions in excess of provision” and essentially relates to commissions under the old contracts in effect prior to October 1, 1954, which did not include any “quality bonus,” the above-mentioned explanation clearly refers not only to plaintiff’s old contracts and its former method of accounting for commissions thereunder on its tax returns, but also to the new contracts. It is significant to note that the explanation does not mention the “quality bonus.”
(c) During the course of Agent Harlor’s investigation and audit, he prepared certain work papers. Regarding the sources of the information reflected in his work papers, Agent *109 Harlor testified that such information was usually obtained from “the general books of accounts and taxpayer’s work papers analysis”; that his work papers with respect to “Salaries and Wages” could have been based upon both the books of account of plaintiff and work papers submitted to him by plaintiff, but that “from the appearance of the work paper, it was probably from the work papers of the taxpayer.” Agent Harlor testified that his work papers reflect that the item for salaries and wages was broken down into various categories, the largest of which was for “Selling and Promotional,” amounting to $10,-519,761.24. Agent Harlor compared this amount with the amount of total sales, and the resulting ratio was compared and found consistent with the ratios for earlier years. The breakdown of the items comprising plaintiff’s deduction for salaries and wages of the Educational Division, as reflected by Agent Harlor’s work papers, did not include any reference to “quality bonus,” and he had no recollection at the time of the trial that any of the figures in his work sheets included “quality bonuses.”
44. Plaintiff also furnished to Kevenue Agent Harlor one of the new contracts; but it was the standard contract used for agreements between plaintiff and its field representatives (house-to-house salesmen), and it contained no mention of the “quality bonus.”
45. As a result of his audit of plaintiff’s federal income tax return for the year ended September 30, 1955, Revenue Agent Harlor proposed certain adjustments resulting in an income tax deficiency of $12,842.10. The parties are in dispute with respect to the credibility of Agent Harlor’s testimony that he had no recollection of the existence of a classification of commission expense identified as the “quality bonus,” and that he never approved of plaintiff’s accounting treatment of any such items. It is important to note that a copy of Agent Harlor’s audit report, submitted to his superiors under date of April 17, 1957, contains no mention of the quality bonus. Plaintiff’s books of account contained entries with respect to quality bonuses and such books of account were available to Agent Harlor for examination. However, there is no evidence that Agent Harlor actually. *110 examined the books of account and noted entries relating to quality bonuses, and it may be reasonably inferred from the entire record that he did not do so. In view of the facts set forth above, it would appear reasonable to conclude that Agent Harlor simply did not examine books of account which identified certain entries as being related to quality bonuses, and that he relied solely upon work papers, documents, and the explanation of the “Schedule M” adjustment furnished to him by plaintiff.
46. Plaintiff agreed to the adjustments proposed by Revenue Agent Harlor. In September 1957, the Commissioner of Internal Revenue assessed a deficiency for the taxablé year ended September 30,1955, of $12,842.10 in tax and $1,097.91 in interest, or a total of $13,940.01. Plaintiff paid said deficiency on September 30,1957.
47. On August 1, 1958, Internal Revenue Agent Selma J. Mortenson commenced an examination of plaintiff’s income tax return and books of account for the taxable year ended September 30, 1956, including an examination of the books of account and records of plaintiff’s Educational Division, which published World Book and Childcraft.
48. (a) Revenue Agent Mortenson did not personally testify during the trial; but the parties stipulated that, in the event she were called as a witness, she would testify to facts contained in a certain portion of a letter sent by her to defendant’s attorney. On the basis of the entire record, it is concluded that the following findings are reasonably accurate.
(b) During the course of her examination of the books and records of plaintiff’s Educational Division, Agent Morten-son was in constant contact with Mr. Joseph C. Hurtgen, assistant treasurer and tax manager of Field Enterprises, Inc. They discussed plaintiff’s operations, accounting method, contracts, the quality bonus, and certain books of account relating to the taxable years ending September 30,1955, and September 30,1956.
(c) While the record does not definitely disclose just what contracts Agent Mortenson asked plaintiff’s representatives to furnish, or that she asked for and actually received a full set of contracts, it is clear that she requested and received certain new contracts, and probably a full set. Agent *111 Mortenson asked many questions about how the quality bonus accounts worked, and Mr. Hurtgen cooperated with her. She also raised questions with respect to the proper time of accrual of quality bonuses, and Mr. Hurtgen explained the method used by plaintiff. Mr. Hurtgen did not object to her questioning with respect to this issue. At Agent Mortenson’s request, plaintiff’s journal sheets and ledgers for the taxable year ended September 30, 1955, as well as for the taxable year ended September 30, 1956, were furnished to her. However, Agent Mortenson did not specifically advise any of plaintiff’s representatives' that she was reexamining plaintiff’s taxable year ended September 30,1955, as well as making a general examination of the taxable year ended September 30, 1956. As best it can be determined from the record, plaintiff made available to Agent Mortenson its records for the taxable year ended September 30, 1955, as well as for the taxable year ended September 30,1956, for the purpose of .enabling her to understand the fiscal 1956 opening balances and the working of the commission and quality bonus accounts. On the basis of books and records and the information furnished to Agent Mortenson, she was able to make and did make adjustments for both fiscal 1955 and 1956. Although Agent Mortenson might have made the adjustment for quality bonus deductions which she proposed in the year 1956 without making a compensating adjustment for the year 1955, the adjustment would have been smaller. Agent Mortenson could not have accurately adjusted quality bonus deductions for the year 1956 without checking the balances for that year against plaintiff’s books of account relating to its managers and sales representatives for fiscal 1955; and such a check necessarily resulted in some examination of plaintiff’s books of account for fiscal 1955.
(d) The issue with respect to the proper time of accrual of quality bonus deductions for federal income tax purposes was the same in both fiscal 1955 and 1956.
(e) About October 1, 1958, Agent Mortenson presented Mr. Hurtgen with a worksheet which reflected that Agent Mortenson was considering making a proposed adjustment for the taxable year ended September 30, 1955, and she *112 requested certain additional information. At tbat time Mr. Hurtgen began to think that Agent Mortenson was making an examination of fiscal 1955, whereupon he refused to give her further information, or to make plaintiff’s books of account for the fiscal year 1955 available to her. She terminated her examination at the offices of the plaintiff.
(f) In all probability, Mr. Hurtgen and possibly other representatives of the plaintiff knew that the application of Agent Mortenson’s method of accounting, with respect to the item of the quality bonus to both the fiscal years 1955 and 1956, would result in a change in each of those years. But Mr. Hurtgen presented credible testimony to the effect that he believed no change for fiscal 1955 actually could or would be made unless a re-examination of that year was made by the Internal Bevenue Service after due notice to plaintiff; that he was unaware of the fact that Agent Mortenson was reexamining fiscal 1955 until after she was furnished with information that prompted and enabled her to make proposed adjustments for both fiscal 1955 and 1956; and that his suspicions were first aroused that Agent Mortenson was re-examining fiscal 1955 about October 1,1958.
(g) Plaintiff did not request a second inspection of its books of account for the fiscal year ended September 80,1955; and no notice was ever given in writing to plaintiff by the Internal Bevenue Service that another inspection would be made of plaintiff’s books of account for the taxable year ended September 80,1955.
(h) Although it is obvious that Agent Mortenson made some examination of plaintiff’s books and records for the taxable year ended September 30, 1955, the record does not clearly disclose the extent of such examination; but it appears to have been of a limited nature rather than a complete re-examination.
49. On October 23, 1958, a conference was held between representatives of plaintiff and Agent Mortenson. At that meeting Agent Mortenson first proposed a specific adjustment for the fiscal year ended September 30, 1956; but she did not propose a specific adjustment for the fiscal year ended September 30, 1955.
*113 50. (a) On October 28, 1058, certain of plaintiff’s representatives and Agent Mortenson held another meeting. As best it can be determined from the testimony, Agent Morten-son did not specifically propose, at that meeting, an adjustment for the fiscal year 1955; but she did ask plaintiff to execute a consent for an extension of the period of limitations on the assessment of deficiencies for the taxable year ended September 30, 1955, which would otherwise expire on December 15,1958. It then became apparent that Agent Mortenson had in mind making a proposed adjustment for fiscal year 1955. Plaintiff’s representatives refused to execute the consent to an extension of the period of limitations on assessment, and they challenged Agent Mortenson’s right to make a re-examination of plaintiff’s books of account for the taxable year ended September 30, 1955.
(b) While it appears that in all probability Agent Mor-tenson continued her work with respect to plaintiff’s income tax returns for the fiscal years 1955 and 1956, it is reasonably clear that about October 1, 1958, she terminated her examination of the books of account for the year 1955. There is no evidence that Agent Mortenson made any examination of plaintiff’s books of account for either the fiscal year 1955 or 1956 subsequent to the meeting on October 28, 1958. Obviously, the adjustments and the tax deficiency for fiscal 1955 proposed by Agent Mortenson were based upon the examinations she made of plaintiff’s books of account for both the fiscal years 1955 and 1956.
(c) It does not appear that either prior to or at the meeting on October 28, 1958, Agent Mortenson specifically advised any of plaintiff’s representatives that she had actually examined plaintiff’s books of account for the fiscal year 1955 for the purpose of proposing adjustments for that year. However, it is clear that several weeks before that meeting the suspicions of certain of plaintiff’s representatives had been alerted to the possibility that Agent Mortenson might be considering a proposed adjustment for the fiscal year 1955. At the time of the meeting, Agent Mortenson clearly indicated that she had made such inspection as was necessary for her to propose a deficiency tax assessment against plaintiff.
51. (a) Revenue Agent Mortenson prepared a supple *114 mental report, dated November 19, 1958, proposing a deficiency in income tax for the taxable year ended September 30, 1955. Such supplemental report was transmitted to plaintiff by letter of the Internal Revenue Service dated January 12,1959. The aforementioned letter of January 12, 1959, clearly refers to the supplemental report of Agent Mortenson, dated November 19,1958, as relating to the “Fiscal Year Ended: 9-30-55,” and the letter reads in pertinent part:
Enclosed you will find copy of report covering examination recently made by a representative of tins office *" * * (Emphasis supplied.)
The supplemental report of Agent Mortenson, dated November 19,1958, contains the following statement:
The return filed for this year [1955] was previously examined and a report submitted April 17, 1957. This is a supplemental report. (Emphasis supplied.)
(b) On December 11, 1958, plaintiff received an official written notice, pursuant to section 7605 of the Internal Revenue Code of 1954, from the Acting Regional Commissioner that a re-examination of its books of account and records for the taxable year ended September 30, 1955, would be made. On the following day, December 12,1958, the Commissioner of Internal Revenue sent plaintiff a statutory notice of deficiency. The statutory period for the assessment of deficiencies for plaintiff’s fiscal year ended September 30, 1955, was to have expired on December 15,1958. Attached to such deficiency notice was a statement entitled “Tax Liability for the Taxable Year Ended September 30, 1955,” which contained the following: “In making the determination of your income tax liability, careful consideration has been given to the Supplemental Report dated November 19, 1958, submitted by Agent Mortenson.” The adjustments to taxable income reflected in the statement precisely match those in Agent Mortenson’s report.
52. (a) It is clear that, as a result of the adjustments proposed by Agent Mortenson in her report of November 19, 1958 (based on the examination relating to the taxable year ended September 30, 1955), the Commissioner of Internal Revenue, for such fiscal year, disallowed $647,657.14 of the *115 $998,028.43 deduction for quality bonuses claimed by plaintiff, thereby reducing such deduction to a total of $350,366.29'.
(b) The $647,657.14 disallowed by the Commissioner represented the portion of the deduction claimed for quality bonuses which was attributable to orders for quality bonus quarters ending within the second 6 months of the taxable year, i.e., orders accepted after the following dates:
(i) For managers in Group A, February 1, 1955; the first day of the quality bonus quarter ending on April 30, 1955;
(ii) For managers in Group B, March 1, 1955, the first day of the quality bonus quarter ending on May 31, 1955; and
(iii) For managers in Group C, April 1, 1955, the first day of the quality bonus quarter ending on June 30, 1955.
53. (a) Following the general examination made by Agent Mortenson of plaintiff’s income tax return and books of account and records for the taxable year ended September 30,1956, and such examination as she made with respect to the taxable year ended September 30, 1955, Agent Mor-tenson submitted a report, dated January 16,1959, in which, among other adjustments, she proposed that $116,542.73 of the $1,138,499.25 deduction claimed by plaintiff for quality bonuses in fiscal 1956 be disallowed. Thereafter, for the taxable year ended September 30, 1956, the Commissioner of Internal [Revenue disallowed $116,542.73 of the above-mentioned deduction, thereby reducing such deduction to $1,021,956.52.
(b) The $116,542.73 disallowed by the Commissioner represented the excess of the amount of $764,199.87, described below, over the $647,657.14 disallowance for the preceding taxable year. The said amount of $764,199.87 represented the portion of the deduction claimed for quality bonus quarters ending within the second 6 months of the 1956 taxable year.
54. For the taxable years ending September 30, 1955, and September 30, 1956, plaintiff accrued quality bonuses on its sales in the amounts of $998,023.43 and $1,138,499.25, respectively, totaling $2,136,522.68. The Commissioner of Internal Revenue allowed net quality bonuses actually paid on sales *116 orders by plaintiff in each of the above-mentioned years which had become bona fide by September 30, 1955, and September 30, 1956. The Commissioner allowed quality bonuses in the amount of $350,366.29 for the year 1955, and in the amount of $1,021,956.52 for the year 1956, making a total of allowed quality bonuses of $1,372,322.81 for such 2-year period. The Commissioner disallowed quality bonuses in the amount of $647,657.11 for the fiscal year ended September 30, 1955, and in the amount of $116,542.73 for the fiscal year ended September 30,1956, making a total quality bonus disallowance of $764,199.87 with respect to such 2-year period.
Plaintiff prepared a schedule, based on an analysis of approximately 11 percent of plaintiff’s orders for fiscal 1956. According to the schedule, the number of orders which had not become bona fide as of September 30, 1956, but regarding which the “bonafication” period was still open, amounted to 29.2 percent. Plaintiff (1) applied the 29.2 percentage figure to the quality bonuses on all orders for fiscal 1956 and (2) deducted the quality bonuses on. orders which had failed to become bona fide by September 30, 1956. In this way, plaintiff concluded that the quality bonuses for fiscal 1955 and fiscal 1956, which had become bona fide by September 30, 1956, would total $1,901,817.61. Plaintiff contends that this schedule reflects that the quality bonuses, for such period, allowed by the Commissioner (in the amount of $1,372,-322.81) fell short by $529,494.80, when compared to plaintiff’s computation (of $1,901,817.61). Therefore, according to plaintiff, $529,494.80 (or approximately 70 percent of the $764,199.87 of quality bonuses disallowed by the Commissioner) related to sales orders which had already become bona fide by the end of the 2-year period.
It should be recognized that, under the new contracts, quality bonuses were subject to certain offsets such as commissions and bonuses paid on sales orders which did not become bona fide. Therefore, the quality bonus in the above-mentioned amount of $1,901,817.61 calculated by plaintiff does not reflect such offsets and such amount is overstated to that extent.
55. The Commissioner of Internal Eevenue, on audit of plaintiff’s income tax returns both for the taxable years in *117 issue and for prior taxable years, did not make any adjustment in plaintiff’s deductions for commissions under the old contracts.
56. (a) Carman G. Blough, a well-known certified public accountant, testified as an expert on behalf of plaintiff. The following findings are based on Mr. Blough’s uncontradicted testimony.
(b) It is a basic principle of accrual accounting that costs be matched to the revenue which they produce so that both are reported in the same year.
(c) If a corporation sells merchandise through installment sales, compensates its salesmen on a commission basis, and accrues for each year the income from all sales during that year, it also should, under proper accounting principles, accrue all commissions payable on such sales. The commissions should be so accrued even though the agreement such corporation has with its salesmen provides that specified commissions shall not be paid unless the purchaser pays for the merchandise. Such commissions are an absolute liability and not a contingency.
(d) If a corporation makes sales under such a sales commission plan and uses the reserve method of accounting for bad debts, sound accounting principles also require that the corporation reduce its accrual of commissions by the portion thereof that its experience indicates will not have to be paid. This reduction in the commissions is the equivalent of a reserve, except that it relates to a cost rather than to a revenue. By this method, sales and commissions are accounted for on the same type of accrual basis.
(e) Based on generally accepted principles of accounting, plaintiff’s system of accounting for commissions under the old contracts on its income tax returns, prior to the fiscal year 1955, was incorrect.
(f) The method used by plaintiff in accruing commissions and quality bonuses with respect to sales of World Book and Childcraft under the new contracts for the fiscal years ended September 30,1955, and September 30,1956, was correct, and the only appropriate one, under accepted principles of accounting.
*118 57. As a result of tbe disallowances described in findings 52, 53, and 54, supra, the Commissioner of Internal Revenue assessed the following deficiencies:

Plaintiff paid $465,626.06 of said deficiencies on May 28, 1959, and the balance of $10,411.59 on June 11,1959.
58. On June 24, 1959, plaintiff filed with the District Director of Internal Revenue claims for refund of the $476,037.65 of deficiency income tax and interest assessed against, and paid by, plaintiff. On or about November 9, 1959, the Commissioner of Internal Revenue disallowed such claims for refund and notified plaintiff accordingly. No part of said sum of $476,037.65 has been repaid or credited to plaintiff.
conclusion on law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is hot entitled to recover, and the petition is dismissed.

 Another set of books published and sold by plaintiff was Chlldcraft. The legal Issues regarding World Book and Chlldcraft are the same. Bor the sake of brevity, the examples and references in this opinion will be limited to World Book.

 Por a detailed discussion of tie former (i.e., pre-October 1954) system and plaintiff’s method of accounting therefor, see findings 14-16, infra.

 Actually, plaintiff had several levels of managers. Pinding 6(b), infra. Although the amount of compensation varied from level to level, the same basic principles applied to each category of managers. Pinding 17, infra.

 With regard to the consequences of a deficit in a manager’s quality-bonus account, see finding 28, infra. See also findings 18 and 27(b), infra.

 See Int. Rev. Code of 1954, § 446.

 The managerial contract also provided for the possibility that charges against a manager for supplies and other expenses would be recovered from “quality bonus payments or other amounts due the manager/’ Finding 17(b) infra. This provision, unlike that regarding charges for orders which did not become bona fide, was not an actual element in determining the manager’s quality bonus. To the contrary, the liability for supplies, etc., was totally unrelated to the quality-bonus system.

 Other cases cited by plaintiff with regard to the proper time for deductions by an accrual-basis taxpayer include the following: American National Co. v. United States, 274 U.S. 99 (1927); United States v. Anderson, supra; Central Cuba Sugar Co. v. Comm’r, 198 F. 2d 214 (2d Cir.), cert. denied 344 U.S. 874 (1952); Air-Way Elec. Appliance Corp. v. Guitteau, 123 F. 2d 20 (6th Cir. 1941); and Warren Co. v. Comm'r, 46 B.T.A. 897 (1942), acq., 1942-2 Cum. Bull. 19, aff’d regarding different issue, 135 F. 2d 679 (5th Cir. 1943).
For reasons explained above, each of the decisions cited by plaintiff is materially distinguishable from the instant ease.

 The quality bonus clue a manager for a particular quarter was paid between 7 and 8 months after the end of the quarter. Finding 28, infra.

 Subsequent to the decision in American Automobile Ass’n v. United States, supra, § 456 was added to the Internal Revenue Code of 1954. This section provides, in effect, that a taxpayer may elect to treat prepaid dues income in a manner like that utilized by the taxpayer in American Automobile Ass’n.
The holding of American Automobile Ass’n was followed by the majority in Schlude v. Comm’r, 372 U.S. 128 (1963). Both of these cases involved the attempted deferral of income. See also Parkchester Beach Club Corp. v. Comm’r, 335 F. 2d 478 (2d Cir. 1964). However, the same principles apply to the treatment of estimated future expenses. Commissioner v. Milwaukee & Suburban Transport Corp., 293 F. 2d 628 (7th Cir. 1961), cert. denied, 368 U.S. 976 (1962); Simplified Tax Records, Inc., 41 T.C. 75, 79 (1963).

 The taxpayer in Brown v. Helvering, supra, was a general agent for fire insurance companies. Eor each policy written, Brown received an “overriding commission.” In the event of cancellation by the policyholder, Brown was required to make a refund of the overriding commission received for that policy. Brown, an accrual-basis taxpayer, deducted from accrued commissions for the year an estimate of the amount of such commissions which would be refunded in future years. The Court upheld disallowance of the deduction. 291 U.S. at 203. üntil the year when cancellation occurred, the liability to make refunds was contingent.
Brown v. Helvering is relevant to the instant case, for both involve the attempted deduction of liabilities which had not become fixed.

 Int. Rev. Code of 1954, § 7605(b), provides as follows:
“* * * No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer’s books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.”

 Also cited by plaintiff is Application of Leonardo, 208 F. Supp. 124 (N.D. Cal. 1962), an action in which the taxpayer sought to suppress the use, as the basis for criminal prosecution, of evidence obtained allegedly in violation of § 7605(b). The court granted the relief requested. 208 P. Supp. at 127. Whether or not the decision in Leonardo was correct, the considerations which prompted that result are not applicable to the case at bar.

 In M. O. Rife, Jr., supra, the majority of the Tax Court helcT that the taxpayers had waived their objection to the second examination. The majority stated, at 747: “If a second examination is made with the knowledge of the taxpayer who raises no objection thereto, such taxpayer has waived the requirement of written notice even though respondent [the Commissioner] uses the information he obtains for a purpose not anticipated by such taxpayer at the time the second examination was made.” Thus, Reineman, supra, and Leonardo, supra, were distinguished. However, a concurring opinion, joined in by five judges, went further and stated that:
“* * * the failure of the Commissioner to comply with the provisions of section 7605 (b) * * * does not invalidate the deficiency determined. I would reach this decision with all due respect for, but notwithstanding the opinion of the Court of Appeals for the Seventh Circuit in Reineman v. United States * * * [supra], which stands alone in this field in the face of numerous judicial statements pointing the other way.
“In my opinion * * * nothing in the language of section 7605(b) or in the legislative history * * * requires a contrary holding. As this and other courts have repeatedly stated, that section of the statute (and its predecessors * * *) merely provides for the relief of a taxpayer from unnecessary and repea,ted examinations of his books and records such as he might otherwise be subjected to under the provisions of sections 7602, 7603, and 7604. [Citations omitted.]”
Eor a discussion of the legislative history of § 7605(b), see United States v. Powell, 379 U.S. 48, 54 (1964).

 TRe term “net orders accepted” was explained as being “orders accepted less orders countermanded, plus orders reinstated.”