ROBERT F. COLLINS, PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 5841–72.    Filed March 7, 1974.

*Jack E. Bratter* and *Bradley D. Marcus*, for the petitioner.
*Alan R. Herson*, for the respondent.

OPINION

Raum, *Judge:* The threshold issue presented concerns whether the Government complied with the procedural dictates of section 7605(b), which provides as follows:

SEC. 7605. TIME AND PLACE OF EXAMINATION.

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

Petitioner argues that the reconsideration of his 1968 return by Revenue Agent Milne was "unnecessary" because the Commissioner had previously concluded an examination with respect to the same taxable year. On the materials before us we hold otherwise.

As a preliminary matter we note that in reexamining petitioner's 1968 tax return, Agent Milne did not conduct an unauthorized inspection of petitioner's books of account, nor does petitioner so allege. Cf. *Geurkink* v. *United States*, 354 F. 2d 629, 631 (C.A. 7) ; *Bouschor* v. *United States*, 316 F. 2d 451, 457–458 (C.A. 8) ; *De Masters* v. *Arend*, 313 F. 2d 79, 85–86 (C.A. 9) ; *Credit Bureau of Erie, Inc.*, 54 T.C. 726, 729; *Millard H. Hall*, 50 T.C. 186, 201–202, affirmed 406 F. 2d 706 (C.A. 5). Neither does petitioner contend that his acquiescence in the Commissioner's first deficiency notice with respect to other items in 1968 qualifies as a "closing agreement" which might constitute a bar of itself to the present deficiency notice.[3]

There is no question that at some time after examining the foundation's records Milne's interest in petitioner's 1968 tax return ripened into an investigation of petitioner's tax liability for that year, separate from the previous investigation conducted by Agent Zelmon. Compare *United States* v. *Fordin* (E.D.N.Y., 72–2 U.S.T.C. par. 9618 at 85,468), with *United States* v. *Schwartz*, 469 F. 2d 977, 984 (C.A. 5). This much is not controverted. While this transformation probably occurred prior to the time Milne advised Agent Smoller in November of 1971 to disallow petitioner's carryover deduction in 1969, the precise moment is irrelevant for our purposes.

It is evident from the legislative history of section 7605(b) that Congress intended that provision to prevent the Internal Revenue

---

[3] SEC. 7121. CLOSING AGREEMENTS.

(b) FINALITY.—If such agreement is approved by the Secretary or his delegate * * * such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, * * *

Service from undertaking repetitive investigations as a method of taxpayer harassment. There is no indication that it was enacted to restrict the scope of the Commissioner's legitimate power to protect the revenue. H. Rept. No. 350, 67th Cong., 1st Sess., p. 16 (1921) ; S. Rept. No. 275, 67th Cong., 1st Sess., p. 31; 61 Cong. Rec. 5202, 5855 (1921) ; H. Rept. No. 356, 69th Cong., 1st Sess., p. 55 (1926) ; 67 Cong. Rec. 3855–3857 (1926). See *United States* v. *Powell*, 379 U.S. 48, 55 fn. 13. In light of this legislative history, an "investigation cannot be said to be 'unnecessary' if it may contribute to the accomplishment of any of the purposes for which the Commissioner is authorized by statute to make inquiry." *De Masters* v. *Arend*, 313 F. 2d 79, 87 (C.A. 9). By analogy to other administrative agencies, the courts have concluded that the Internal Revenue Service may investigate merely on the suspicion that taxes are owed; stated otherwise, in the absence of a showing that the Commissioner acted arbitrarily or in excess of his statutory authority, an investigation is not unnecessary. *United States* v. *Powell*, 379 U.S. at 57; *De Masters* v. *Arend, supra* at 89–90. Cf. *Application of Magnus*, 196 F. Supp. 127, 128–129 (S.D. N.Y.), affirmed 299 F. 2d 335, 337 (C.A. 2), certiorari denied 370 U.S. 918. In the present circumstances, Agent Milne's knowledge both that petitioner had regarded the foundation as publicly supported in 1968 and that he had claimed a carryover deduction in 1969 in respect of his 1968 contribution to the foundation left little room to doubt that petitioner had claimed an excessive deduction in 1968. To attribute arbitrariness to an investigation arising from these facts is simply untenable.

Petitioner alleges that the investigation was nevertheless "unnecessary" because the Government initiated the investigation in an unlawful effort to procure his agreement to the proposed adjustment to the foundation's tax liability on account of the existence of unrelated business income. In support of his contention he refers us to the fact that it was at the instigation of Agent Milne that the parties met on February 8, 1972, to try to reach agreement on the foundation's tax liability. When petitioner declined to acquiesce, Milne proceeded directly to request permission to reopen petitioner's individual return for 1968.

To be sure, an investigation which is conducted in order to pressure the taxpayer with respect to a collateral issue may be an improper purpose sufficient to render such investigation "unnecessary" and thus violative of section 7605(b). *United States* v. *Powell*, 379 U.S. 48, 58 (dictum). But we are unpersuaded that such a motive underlay Milne's actions. To the contrary, prior to obtaining permission to reopen the return, Milne avoided any suggestion of his intention in that regard even though he had been aware of the possible tax liability

for at least several months. Indeed, his request for the February 8, 1972, meeting indicates to us an unmistakable objective to bring to a final conclusion his and petitioner's respective positions with regard to the foundation before auditing petitioner's individual return precisely in order to avoid even the appearance of applying improper pressure. Our conclusion is buttressed by Milne's unequivocal refusal to accept the very arrangement which petitioner alleges he sought when subsequently offered by petitioner. Furthermore, the juxtaposition of the February 8, 1972, meeting and Milne's request to reopen the return does not bespeak governmental harassment but rather reflects the time pressure exerted by the statutory limitations period for petitioner's 1968 tax liability due to expire shortly thereafter. In essence, petitioner's position is tantamount to challenging the Commissioner's authority to conduct simultaneous investigations of the several taxable capacities relating to a single individual. This we deem to be a wholly unwarranted extension of section 7605(b), and we accordingly refuse to adopt it.[4]

Irrespective of section 7605(b), petitioner further argues that the Commissioner erred in reopening the audit of petitioner's 1968 tax return after it had become a closed case within the meaning of Rev. Proc. 68–28, 1968–2 C.B. 912, 913, sec. 3.01(1).[5] Specifically, petitioner alleges that Agent Milne's decision to reopen the case did not conform to express conditions for such action detailed in Rev. Proc. 68–28. There it is provided, in relevant part:

Sec. 4. Policy.

.01 The Internal Revenue Service will not reopen any case closed after examination by a district office * * * to make an adjustment unfavorable to the taxpayer unless:

1. There is evidence of fraud, malfeasance, collusion, concealment or misrepresentation of a material fact; or

2. The prior closing involved a clearly defined substantial error based on an established Service position existing at the time of the previous examination; or

3. Other circumstances exist which indicate failure to reopen would be a serious administrative omission.

.02 All reopenings must be approved by the Assistant Regional Commissioner (Audit), * * *

---

[4] In so deciding this matter, we have no need to face the corollary issue, namely, whether a violation of sec. 7605(b) would taint the ensuing deficiency notice. We do note, however, that although the courts have divided on this issue, there is strong support for the view that failure to comply with the requirements of sec. 7605(b) does not render the deficiency notice a nullity. Compare *M. O. Rife, Jr.,* 41 T.C. 732, 751 (concurring opinion); *Field Enterprises, Inc.* v. *United States,* 348 F. 2d 485, 491 (Ct. Cl.), certiorari denied 382 U.S. 1009; *Philip Mangone Co.* v. *United States,* 54 F. 2d 168, 171–172 (Ct. Cl.); with *Reineman* v. *United States,* 301 F. 2d 267, 271–272 (C.A. 7); *Application of Leonardo,* 208 F. Supp. 124, 127 (N.D. Cal.).

[5] Sec. 3. Definitions.

.01 Closed Case:

1. A case agreed at the district level is considered closed when the taxpayer is notified in writing, after district conference, if any, of adjustments to tax liability or acceptance of his return without change.

Petitioner does not contend that Agent Milne did not obtain the necessary approval, and the Commissioner does not question that the case was closed.

It is too well settled for discussion that procedural rules, such as Rev. Proc. 68–28, are merely directory, not mandatory, "and compliance with them is not essential to the validity of a notice of deficiency." *Luhring* v. *Glotzbach*, 304 F. 2d 560, 563 (C.A. 4). Accord, *Cleveland Trust Co.* v. *United States*, 421 F. 2d 475, 481–482 (C.A. 6) ; *Geurkink* v. *United States*, 354 F. 2d 629, 632 (C.A. 7) ; *Anthony B. Cataldo*, 60 T.C. 522, 523; *Philip F. Flynn*, 40 T.C. 770, 773. Furthermore, the evidence does not persuade us that Agent Milne's action was beyond the permissible limits of Rev. Proc. 68–28 regardless of whether he based his decision to reopen petitioner's 1968 case upon either section 4.01(2) or 4.01(3).

As a result of our conclusion that the Commissioner has conformed to the procedural aspects attendant upon reopening a closed year of a taxpayer, it is necessary to address ourselves to the substance of the deficiency determined by the Commissioner. Section 170, as effective in 1968,[6] contemplated a bifurcated scheme for charitable deductions. Section 170(b)(1)(B) provided a general rule, permitting an individual taxpayer to deduct charitable contributions to bona fide charities [7] in a single year to the extent of 20 percent of his adjusted gross income without respect to any net operating loss carryback. Section 170(b)(1)(A) allowed an additional deduction to the extent of 10 percent of a taxpayer's adjusted gross income for contributions to organizations of the type enumerated therein. Included among these

---

[6] Sec. 201 of the Tax Reform Act of 1969 (Pub. L. 91–172) made various changes in the statutory scheme relating to charitable deductions. All citations of Code sections and Treasury regulations herein with respect to charitable deductions refer to those in effect in 1968.

[7] Sec. 170(c) enumerated those types of charities to which donations would qualify as deductible charitable contributions. As it pertains to the foundation, sec. 170(c)(2) provided as follows :

SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\* \* \* \* \* \* \*

(2) A CORPORATION, TRUST, OR COMMUNITY CHEST, FUND, OR FOUNDATION—

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States ;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals ;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual ; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B).

charitable recipients upon which Congress conferred this preferential status was:

(vi) an organization referred to in subsection (c) (2) *which normally receives a substantial part of its support* (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a)) from a governmental unit referred to in subsection (c)(1) or *from direct or indirect contributions from the general public * * ** [Emphasis supplied.]

In his 1968 return, petitioner availed himself of the additional 10-percent deduction with respect to his contribution to the Collins Foundation. He does not contend that the foundation was a qualified recipient other than by virtue of section 170(b)(1)(A)(vi) which, he argues, encompassed a good faith, albeit frustrated, intent to secure public financing. The Commissioner, on the other hand, urges that because petitioner is the foundation's sole contributor it has not received any support from the "general public" and hence cannot provide petitioner with a basis for an additional 10-percent deduction. We conclude that the Commissioner must prevail.

In our view, the plain language of the statute, as reinforced by applicable regulations, leaves no room for any conclusion other than that there had been a failure to satisfy the statutory requirement. Section 170(b)(1)(A)(vi) is perfectly clear in its requirement that, in order to qualify, an organization "[*receive*] a substantial part of its support" (emphasis supplied) from the general public. The inescapable import of the word "receive" is that Congress intended an objective test uncomplicated by any latent hopes or aspirations for such support. Without more there would be no question that the foundation falls outside the ambit of subparagraph (vi).

The Treasury regulations, however, recognized the difficulty of a newly formed organization in meeting the statutory qualification even though a particular organization was likely to become publicly supported. Consequently, there was provided a "facts and circumstances test," an alternative means of fulfilling the public-support requirement, which looked to objectively manifested factors other than actual donations. Sec. 1.170–2(b)(5)(iii) (*c*), Income Tax Regs. The application of this alternative test was explicitly limited, however, by the proviso that "*under no circumstances* will an organization which normally receives substantially all of its contributions (directly or indirectly) from the members of a single family * * * qualify as a 'publicly supported' organization" (emphasis supplied). Sec. 1.170–2 (b)(5)(iii)(*c*)(*2*), Income Tax Regs. In 1968, as well as in the subsequent years of the foundation, petitioner was the sole contributor. Hence, the foundation fails to satisfy even the threshold requirement

which would obligate this Court to consider the "facts and circumstances" test.

Moreover, even if the foregoing threshold requirement were complied with, it is plain from a reading of these detailed regulations that the foundation does not come within the terms thereof. In the first place, it was not "constituted so as to attract substantial support from contributions, directly or indirectly, from a representative number of persons in the community or area in which it operates." Sec. 1.170–2(b)(5)(iii)(c)(3), Income Tax Regs.[8] Its research objectives are elusive at best, and hardly suggest any likelihood of public support. Further, there is no evidence that the foundation made any "bona fide solicitations for broad based public support," or "that its organizational structure and method of operation are such as to require bona fide solicitation for broad based public support." In addition, the regulations (sec. 1.170–2(b)(5)(iii)(c)(4))[9] look to the

---

[8] Sec. 1.170–2(b)(5)(iii), Income Tax Regs. :

(c) *Facts and circumstances test.* * * *

\* \* \* \* \* \* \*

(3) For purposes of the facts and circumstances test the most important consideration is the organization's source of support. An organization will be considered a "publicly supported" organization if it is constituted so as to attract substantial support from contributions, directly or indirectly, from a representative number of persons in the community or area in which it operates. In determining what is a "representative number of persons," consideration must be given to the type of organization and whether or not the organization limits its activities to a special field which can be expected to appeal to a limited number of persons. An organization is so constituted if, for example, it establishes that it does in fact receive substantial support from contributions from a representative number of persons; that pursuant to its organizational structure and method of operation it makes bona fide solicitations for broad based public support, or, in the case of a newly created organization, that its organizational structure and method of operation are such as to require bona fide solicitations for broad based public support; that it receives substantial support from a community chest or similar public federated fund raising organization, such as a United Fund or United Appeal; or that it has a substantial number of members (in relation to the community it serves, the nature of its activities, and its total support) who pay annual membership dues.

[9] Sec. 1.170–2(b)(5)(iii)(c), Income Tax Regs. :

(c) *Facts and circumstances test.* * * *

\* \* \* \* \* \* \*

(4) Although primary consideration will be given to the source of an organization's support, other relevant factors may be taken into account in determining whether or not the organization is of a public nature, such as :

(i) Whether the organization has a governing body (whether designated in the organization's bylaws, certificate of incorporation, deed of trust, etc., as a Board of Directors, Board of Trustees, etc.) which is comprised of public officials, of individuals chosen by public officials acting in their capacity as such, or of citizens broadly representative of the interests and views of the public. This characteristic does not exist if the membership of an organization's governing body is such as to indicate that it represents the personal or private interests of a limited number of donors to the organization (or persons standing in a relationship to such donors which is described in section 267(b) and the regulations thereunder), rather than the interests of the community or the general public.

(ii) Whether the organization annually or more frequently makes available to the public financial reports or, in the case of a newly created organization, is constituted so as to require such reporting. For this purpose an information or other return made pursuant to a requirement of a governmental unit shall not be considered a financial report. An organization shall be considered as making financial reports of its operations

composition of the organization's governing body for evidence of representation of the interests and views of the public, and state explicitly that "This characteristic does not exist if the membership of an organization's governing body is such as to indicate that it represents the personal or private interests of a limited number of donors to the organization." There could hardly exist a clearer example of an ineligible organization than the foundation in which the board of trustees is comprised exclusively of the sole contributor's family for the express purpose of retaining individual control of the foundation's activities. Furthermore, there is no evidence that the foundation was required to publish or otherwise to distribute its financial reports or that it was required to provide its facilities or services to the public at large. Sec. 1.170–2(b)(5)(iii)(c)(4) (ii) and (iii), Income Tax Regs.

It is evident from the foregoing that from its inception the foundation lacked the objectively ascertainable characteristics which would indicate that it was organized in a manner to elicit broad-based public support. Quite the contrary, all of the evidence underscores its highly circumscribed orientation. Rather, the foundation's intimate relationship to petitioner's wholly private purposes predominated its existence, and petitioner was therefore not entitled to the additional 10-percent deduction allowed by section 170(b)(1)(A), even under the Commissioner's more liberal "facts and circumstances" test.

Due to the computational error in the deficiency notice (see footnote 1 *supra*),

*Decision will be entered under Rule 155.*

---

available to the public if it publishes a financial report in a newspaper which is widely circulated in the community in which the organization operates or if it makes a bona fide dissemination of a brochure containing a financial report.

(*iii*) If the organization is of a type which generally holds open to the public its buildings (as in the case of a museum) or performances conducted by it (as in the case of a symphonic orchestra), whether the organization actually follows such practice, or, in the case of a newly created organization, is so organized as to require that its facilities be open to the public.