PLEASANTON GRAVEL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6095-73.    Filed June 30, 1975.

*Paul E. Anderson,* for the petitioner.
*William E. Saul* and *James Booher,* for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income taxes in the following amounts:

| TYE Oct. 31— | Deficiency |
|---|---|
| 1967 | $23,570.73 |
| 1968 | 21,570.17 |
| 1969 | 26,133.00 |

The ultimate issue in this case is whether petitioner is a personal holding company subject to the personal holding company tax imposed by section 541, I.R.C. 1954. The only substantial question bearing on this issue is whether petitioner's receipts from the sale of its sand and gravel deposits constituted royalty income or long-term capital gain. In addition to the substantive issue herein, there are presented two questions pertaining to the procedures followed by the Commissioner: (1) Is the Commissioner barred from the assessment and collection of the deficiencies herein due to the expiration of the applicable period of limitations, and (2) do the words "Closed on Survey," stamped on the face of petitioner's returns by the Commissioner, indicate that the Commissioner conducted an examination of petitioner's books of account within the meaning of section 7605(b) or that the case was closed within the meaning of section 601.105(j), Proced. & Admin. Regs., as a result of which further examination by the Commissioner was barred?

### FINDINGS OF FACT

The parties have stipulated most of the facts, and their several stipulations, together with accompanying exhibits, are incorporated herein by this reference.

Pleasanton Gravel Co. (petitioner) is a California corporation. At the time of filing its petition herein, its principal office was in Oakland, Calif.

Following its incorporation in 1956, petitioner issued 800 shares of $25 par stock to George W. Jamieson in return for $20,000. He has since remained petitioner's sole stockholder. Shortly thereafter petitioner acquired 173 acres of land (Pleasanton property) situated in the Livermore Valley near Pleasanton, Calif., from George W. Jamieson for $18,000. On January 1, 1959, petitioner entered into an agreement concerning the sand and gravel deposits on its property with Jamieson Co., a partnership consisting of George W. Jamieson and, for the years here in issue, his father, George G. Jamieson, as equal partners.

By that agreement petitioner purported to "sell and grant to Buyer [Jamieson Co.] forever, all the rock, sand and gravel deposits in, on and under" the therein described portion of the Pleasanton property. Pertinent terms and conditions of agreement were as follows:

1. Buyer shall have the right to operate upon the premises described in "Exhibit A" hereto such number of gravel pits and quarries as may be proper under approved quarrying procedures and to excavate and remove from the said premises such rock, sand and gravel as may be proper and profitable under good quarrying practices. * * *

Buyer shall operate its gravel pits and quarries upon said premises in accordance with good quarrying practices and shall not abandon any gravel pit or refill the same with overburden or dirty water until Buyer in its judgment determines that all rock, sand and gravel that can profitably be recovered therefrom under good quarrying practices has been removed.

2. The Seller makes no warranty to Buyer as to the amount of rock, sand and gravel that may profitably be quarried in, on or under the lands * * *, however, if the water table should fall below one hundred (100) feet, Buyer may expect to profitably remove three million (3,000,000) tons of rock, sand and gravel from the deposits herein sold to Buyer.

3. The Buyer shall pay to Seller for every ton of rock, gravel or sand removed by Buyer, a specific amount for each ton so removed by Buyer. The price to be paid by Buyer for each ton so removed will depend on the average wholesale selling price in Pleasanton, California, during the month of removal for the materials so removed. Attached hereto as "Exhibit B" is a schedule setting forth the price that will be payable by Buyer for each ton of rock, gravel or sand removed (Column II) based on the base wholesale price per ton in Pleasanton, California, for rock, gravel and sand (Column I).

Buyer shall deliver to Seller a report in writing showing the number of tons of gravel, rock and sand removed from said premises during the preceding month on or before the 15th day of the calendar month next succeeding the calendar month in which Buyer makes its first removal of gravel, rock or sand from said premises and shall deliver to Seller a like report on or before the 15th day of each calendar month thereafter that Buyer is conducting quarry operations on the premises, and Buyer shall pay to Seller a sum equal to the total purchase price for all gravel, rock and sand as shown in the report due on the 15th day of the preceding month.

4. If at any time during quarrying operations Buyer determines that rock, gravel and sand can no longer be profitably quarried and removed from the lands described in "Exhibit A" hereto, Buyer shall have the option to terminate this agreement upon sixty (60) days notice to Seller.
* * *

6. Buyer may erect upon the lands particularly described in "Exhibit A" hereto such machinery, trackage and buildings roads [sic] as it may deem necessary or convenient for the proper and economical operation of the gravel pits and quarries upon said premises. * * *
* * *

9. Buyer shall keep the lands * * * free from any liens arising out of any work performed for, materials furnished to or obligations incurred by Buyer.

10. Buyer shall, at its sole cost and expense, comply with all the requirements of all Municipal, State and Federal authorities now in force or which hereafter may be in force pertaining to its operations upon said premises, and shall faithfully observe in its operations on said premises all Municipal ordinances and State and Federal statutes now in force or which may hereafter be in force. * * *

The attached Schedule B referred to in paragraph 3 of the agreement provided that petitioner was to be paid a minimum of $0.05 per ton of rock, sand, and gravel removed plus an additional $0.01 per ton for each $0.30 (or part thereof) increment in the wholesale selling price above $1.50 per ton. Thus, for example, if the per ton wholesale selling price of rock, sand, and gravel was $1.90 per ton, petitioner was entitled to receive $0.07 per ton from Jamieson Co.; if it were $2.20 per ton, petitioner would receive $0.08 per ton, and so on. This payment schedule was amended on January 1, 1962, to provide that—

In event [sic] and whenever one million (1,000,000) or more tons of Rock, Sand and Gravel is sold by Pleasanton Gravel Company to Jamieson Company in any one calendar year then the purchase price to be paid shall be reduced 20% as applied to Exhibit B * * *

Under this agreement, Jamieson Co. mined the sand and gravel which it then processed with machinery located on the same property. The processing consisted of washing, sizing, screening, crushing, and stockpiling the various materials mined. Jamieson Co. thereupon sold these materials to Rhodes-Jamieson, Ltd., a corporation which, for the years in issue, also was owned by George W. Jamieson and his father, 49 percent and 51 percent, respectively. Rhodes-Jamieson, Ltd., used the gravel and sand both for ready-mix concrete and for sales to third parties. Neither petitioner nor Jamieson Co. had any employees; instead, they each paid a fee to Rhodes-Jamieson, Ltd., to perform their respective activities, including the operation of the processing machinery. In addition, Jamieson Co. leased the processing machinery from Rhodes-Jamieson, Ltd.

Petitioner's primary source of income since its incorporation has been the proceeds received from Jamieson Co., pursuant to their agreement. Despite their estimate in the agreement that Jamieson Co. would be able to remove a total of 3 million tons of material, Jamieson Co. in fact removed over 14 million tons by the close of petitioner's fiscal year which ended in 1969, and

more than an additional 4 million tons before exhausting the available supplies in 1973 (other than those beneath the area which Jamieson Co. used for processing). As a result of Jamieson Co.'s mining activity, the portion of the Pleasanton property from which deposits had been removed was left covered with water which, due to the high level of the water table, could not be drained away.

For each of its taxable years in issue, petitioner filed a Federal Corporation Income Tax Return, Form 1120. On none of those returns did it indicate in the space provided that it was a personal holding company nor did it attach thereto a separate schedule showing its gross income, adjusted ordinary gross income, and the names and addresses of its stockholders. Petitioner stated on each return that its principal business activity was "Gravel Mining & Sales," and it reported income and expenses for the years in issue as follows:

| Description<br>Income | 10/31/67 | 10/31/68 | 10/31/69 |
|---|---|---|---|
| Gravel sales | $67,776.93 | $71,143.41 | $81,654 |
| Rental income | 1,000.00 | 1,000.00 | 1,000 |
| Interest income | 7,430.50 | 9,225.00 | 9,225 |
| Total income | 76,207.43 | 81,368.41 | 91,879 |
| Expenses | | | |
| Repairs | 0 | 7,334.62 | 200 |
| Rents | 1,000.00 | 1,000.00 | 1,000 |
| California franchise taxes | 2,182.35 | 3,722.82 | 3,428 |
| Property taxes | 12,228.76 | 14,337.32 | 13,917 |
| Depreciation | 2,606.98 | 4,345.86 | 8,016 |
| Depletion | 3,388.85 | 3,557.17 | 4,083 |
| Professional services | 630.00 | 625.00 | 685 |
| Outside office services | 1,200.00 | 1,200.00 | 1,200 |
| Total expenses | 23,236.94 | 36,122.79 | 32,529 |
| Taxable income | 52,970.49 | 45,245.62 | 59,350 |

Pleasanton had adjusted gross income and adjusted gross income from gravel transfers for the years in issue as follows:

| | TYE Oct. 31— | | |
|---|---|---|---|
| | 1967 | 1968 | 1969 |
| Adjusted gross income [1] | $54,800.49 | $54,405.24 | $61,435 |
| Adjusted gross income from gravel transfers | 47,369.99 | 45,180.24 | 52,210 |

[1] Although the parties' stipulation referred to "Adjusted ordinary gross income," we assume this was inadvertent inasmuch as it is the essence of petitioner's case that its gross income from gravel transfers was *not* includable in its adjusted ordinary gross income.

On its Federal income tax returns for these years, petitioner reported its income from the gravel transfers on the line entitled "Gross receipts or gross sales." In its returns for prior years, petitioner had at times reported such income as "royalties." In each of its taxable years ended in 1960 through 1969, petitioner deducted from its income a depletion allowance in an amount equal to 5 percent of its gross income from gravel transfers. In none of the years at issue or prior thereto did petitioner treat the gravel-related income as capital gains. Also, there is no evidence that petitioner paid any dividends during these years.

Petitioner filed its Federal income tax returns for the first 2 taxable years in issue with the District Director of Internal Revenue at San Francisco, Calif.; for the remaining taxable year in issue it filed with the Western Service Center at Ogden, Utah. Payments or evidences of credits for prior payments were removed and proper credit made thereof. Each return was checked for mathematical accuracy and internal consistency. The return was then accepted as being filed and thereupon delivered to a classifying officer of the Internal Revenue Service. It would then be assigned to a revenue agent who worked in the classification section. He reviewed each of the returns, and, upon the basis of criteria not disclosed herein, made a determination and ordered a clerk to place the stamp "Closed on Survey" or "Field Audit" on the face of the returns. In accordance with this procedure the returns for the first 2 of the years here in issue were stamped "Closed on Survey" while the return for the taxable year ended in 1969 was marked with the imprint "Field Audit." For each of these taxable years, the Commissioner conducted only one actual inspection of petitioner's books and records kept at its home office.

By reason of three Forms 872, executed on behalf of petitioner, the period of limitation upon assessment of income and profits tax for each of the years in issue was extended until June 30, 1973. In the deficiency notice, dated June 25, 1973, the Commissioner determined that—

Since over 60 percent of your adjusted ordinary gross income * * * [in each of the years in issue] consisted of personal holding company income as defined in section 543, you qualified as a personal holding company under section 542 of the Internal Revenue Code in those years. Accordingly, you are subject to the personal holding company tax under section 541 of the Code.

In its amended petition herein, petitioner claimed refunds for each of the taxable years in issue on account of its alleged error in reporting the amounts received on the sale of gravel as ordinary income instead of capital gain.

## OPINION

At issue is whether, for the taxable years before us, petitioner is subject to the personal holding company tax imposed by section 541.[2] The incidence of that tax is reserved for personal holding companies as defined in sections 542-544. The starting point of the irritatingly convoluted[3] statutory path set forth therein is section 542(a),[4] which provides that the term "personal holding company" means any corporation (with certain exceptions not relevant here) if (1) at least 60 percent of its "adjusted ordinary gross income" for the taxable year is "personal holding company income," and (2) more than half of its stock is owned by not more than five individuals (with which requirement petitioner admittedly complies). Thus, the critical determinations in this case are the amounts of petitioner's personal holding company income and its adjusted ordinary gross income.

"Personal holding company income" is, by definition, a specified portion of "adjusted ordinary gross income,"[5] the calculation of which, in turn, requires the prior computation of first, gross income, and then, "ordinary gross income." Section 61 and the regulations thereunder govern the determination of gross

---

[2] SEC. 541. IMPOSITION OF PERSONAL HOLDING COMPANY TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the undistributed personal holding company income (as defined in section 545) of every personal holding company (as defined in section 542) a personal holding company tax equal to 70 percent of the undistributed personal holding company income.

[3] Cf. *Commissioner v. Welch,* 345 F. 2d 939, 941 n. 2 (5th Cir.); *Fred Frankfort, Jr.,* 52 T.C. 163, 168; *David A. Foxman,* 41 T.C. 535, 551 n. 9, affirmed 352 F. 2d 466 (3d Cir.); *Van Products, Inc.,* 40 T.C. 1018, 1028; *Thomas G. Lewis,* 35 T.C. 71, 76.

[4] SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if—

(1) ADJUSTED ORDINARY GROSS INCOME REQUIREMENT.—At least 60 percent of its adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year is personal holding company income (as defined in section 543(a)), and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * *

[5] SEC. 543. PERSONAL HOLDING COMPANY INCOME.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the adjusted ordinary gross income which consists of * * *

income, sec. 1.542-2, Income Tax Regs., the amounts of which here are not disputed by the parties. "Ordinary gross income" is defined in section 543(b)(1) [6] as the gross income determined by excluding capital gains, section 1231(b) gains, and certain additional amounts in the case of a foreign corporation. By reason of section 543(b)(2),[7] ordinary gross income becomes "adjusted

---

[6] SEC. 543. PERSONAL HOLDING COMPANY INCOME.

(b) DEFINITIONS.—For purposes of this part—

(1) ORDINARY GROSS INCOME.—The term "ordinary gross income" means the gross income determined by excluding—

(A) all gains from the sale or other disposition of capital assets,

(B) all gains (other than those referred to in subparagraph (A)) from the sale or other disposition of property described in section 1231(b), and

(C) in the case of a foreign corporation all of the outstanding stock of which during the last half of the taxable year is owned by nonresident alien individuals (whether directly or indirectly through foreign estates, foreign trusts, foreign partnerships, or other foreign corporations), all items of income which would, but for this subparagraph, constitute personal holding company income under any paragraph of subsection (a) other than paragraph (7) thereof.

Sec. 543(b)(1) was amended by sec. 104(h)(2)(C) of the Foreign Investors Tax Act of 1966, Pub. L. 89-809, approved Nov. 13, 1966, by the addition of subpar. (C). This amendment was made applicable with respect to taxable years beginning after Dec. 31, 1966.

[7] SEC. 543. PERSONAL HOLDING COMPANY INCOME.

(b) DEFINITIONS.—For purposes of this part—
* * *

(2) ADJUSTED ORDINARY GROSS INCOME.—The term "adjusted ordinary gross income" means the ordinary gross income adjusted as follows:

(A) RENTS.—From the gross income from rents (as defined in the second sentence of paragraph (3) of this subsection) subtract the amount allowable as deductions for—

(i) exhaustion, wear and tear, obsolescence, and amortization of property other than tangible personal property which is not customarily retained by any one lessee for more than three years,

(ii) property taxes,

(iii) interest, and

(iv) rent,

to the extent allocable, under regulations prescribed by the Secretary or his delegate, to such gross income from rents. The amount subtracted under this subparagraph shall not exceed such gross income from rents.

(B) MINERAL ROYALTIES, ETC.—From the gross income from mineral, oil, and gas royalties described in paragraph (4), and from the gross income from working interests in an oil or gas well, subtract the amount allowable as deductions for—

(i) exhaustion, wear and tear, obsolescence, amortization, and depletion,

(ii) property and severance taxes,

(iii) interest, and

(iv) rent,

to the extent allocable, under regulations prescribed by the Secretary or his delegate, to such gross income from royalties or such gross income from working interests in oil or gas wells. The amount subtracted under this subparagraph with respect to royalties shall not exceed the gross income from such royalties, and the amount subtracted under this subparagraph with respect to working interests shall not exceed the gross income from such working interests.

(C) INTEREST.—There shall be excluded—

(i) interest received on a direct obligation of the United States held for sale to customers in the ordinary course of trade or business by a regular dealer who is making a primary market in such obligations, and

ordinary gross income" by excluding from it the amounts of certain deductions allocable to rental income and to mineral, oil, and gas royalties [8] plus the amount of interest derived from several specified sources. And under section 543(a), the term "personal holding company income" means, as far as is relevant here, that portion of the adjusted ordinary gross income which consists of, among other items:

(3) MINERAL, OIL, AND GAS ROYALTIES.—The adjusted income from mineral, oil, and gas royalties; except that such adjusted income shall not be included if—

(A) such adjusted income constitutes 50 percent or more of the adjusted ordinary gross income,

(B) the personal holding company income for the taxable year (computed without regard to this paragraph, and computed by including as personal holding company income copyright royalties and the adjusted income from rents) is not more than 10 percent of the ordinary gross income, and

(C) the sum of the deductions which are allowable under section 162 (relating to trade or business expenses) other than—

(i) deductions for compensation for personal services rendered by the shareholders, and

(ii) deductions which are specifically allowable under sections other than section 162,

equals or exceeds 15 percent of the adjusted ordinary gross income.

Once again, it is the purpose of these successive computations to arrive at the corporation's "adjusted ordinary gross income" and its "personal holding company income," the two components by which a personal holding company is identified in section 542(a)(1).

*Royalty income issue.*—It is petitioner's primary contention that its agreement with Jamieson Co. effected a sale of its entire interest in the sand and gravel deposits, the proceeds of which were capital gains rather than royalties. On this basis it reasons that the income from that sale was not a part of its ordinary gross income and therefore did not contribute either to adjusted

---

(ii) interest on a condemnation award, a judgment, and a tax refund.

(D) CERTAIN EXCLUDED RENTS.—From the gross income consisting of compensation described in subparagraph (D) of paragraph (3) subtract the amount allowable as deductions for the items described in clauses (i), (ii), (iii), and (iv) of subparagraph (A) to the extent allocable, under regulations prescribed by the Secretary or his delegate, to such gross income. The amount subtracted under this subparagraph shall not exceed such gross income.

[8] With respect to mineral royalties, the amount remaining after the exclusion of the enumerated deductions is defined as "adjusted income from mineral, oil, and gas royalties." Sec. 543(b)(4).

ordinary gross income or to personal holding company income. The parties agree that if the proceeds were capital gain, petitioner is not subject to the personal holding company tax because it failed to meet the 60-percent requirement upon which classification under section 542(a)(1) as a personal holding company is predicated. The Commissioner, however, takes exception to petitioner's conclusion as to the nature of the sand and gravel income. It is the Commissioner's contention that this was ordinary income derived from mineral royalties. It therefore constituted ordinary gross income, and, because it was mineral royalty income, it also entered into the computation of both adjusted ordinary gross income under section 543(b)(2)(B) and personal holding company income by reason of section 543(a)(3).

Alternatively, petitioner takes the position that, for the taxable years ended in 1967 and 1969, even if the proceeds in question were mineral royalties, petitioner otherwise met the three conditions of section 543(a)(3) for which reason the mineral royalty income was not includable in its personal holding company income, and its remaining personal holding company income did not amount to 60 percent of its adjusted ordinary gross income. In this regard, petitioner argues that the California franchise and real property taxes which it paid were not "deductions which are specifically allowable under sections other than section 162," as provided in section 543(a)(3)(C)(ii), with the result that its section 162 deductions exceeded 15 percent of its adjusted ordinary gross income, even including the mineral royalties. The Commissioner here disputes not only the mathematics involved in petitioner's allocation of such taxes, but more basically, he denies that they fell beyond the reach of section 543(a)(3)(C)(ii) inasmuch as they were specifically deductible by reason of section 164. We hold in favor of the Commissioner.

Whether a taxpayer is entitled to capital gains treatment upon the sale of sand, gravel, and the like is a familiar question with which the courts have wrestled seemingly all too often. From the plethora of opinions on this subject has emerged the now widely accepted principle by which the facts of each case are to be measured. Often referred to as the "economic interest" test, it was first propounded by the Supreme Court in *Palmer v. Bender*, 287 U.S. 551, with respect to the depletion allowance for oil and gas. In order to be eligible for that deduction, the taxpayer must

have held an economic interest in the mineral property, the required evidence of which was that the taxpayer (1) acquired an interest therein through investment, and (2) secured income derived solely from the mineral extraction "to which he must look for a return of his capital." 287 U.S. at 557.

The extension of this criterion to the taxation of proceeds from the extraction of hard minerals may be stated as follows: if the property owner disposes of his entire interest in the deposits "in place," unconditionally and without further interest in their removal, then his income therefrom is not disqualified from being regarded as capital gain by reason of the form of the transaction; however, where the terms of the agreement are tantamount to a lease for the exploitation of the land whereby the property owner must look to the extraction of the mineral in order to recover his capital, then the owner has retained an economic interest in the deposits and in their production which interest renders the gain reflected in the proceeds therefrom ordinary income in his hands. *Alkire v. Riddell,* 397 F. 2d 779, 780 (9th Cir.); *Hair v. Commissioner,* 396 F. 2d 6, 8 (9th Cir.), affirming a Memorandum Opinion of this Court; *Hartman Tobacco Co. v. United States,* 471 F. 2d 1327, 1329-1330 (2d Cir.); *Laudenslager v. Commissioner,* 305 F. 2d 686, 690-691 (3d Cir.), affirming a Memorandum Opinion of this Court; *Cox v. United States,* 497 F. 2d 348, 350 (4th Cir.); *Wood v. United States,* 377 F. 2d 300, 304-305 (5th Cir.), certiorari denied 389 U.S. 977; *Gitzinger v. United States,* 404 F. 2d 191, 193 (6th Cir.); *Schreiber v. United States,* 382 F. 2d 553, 554 (7th Cir.); *Dingman v. United States,* 429 F. 2d 70, 72 (8th Cir.); *Samuel L. Green,* 35 T.C. 1065.

Where, as here, it is not disputed that petitioner acquired an interest in the deposits through investment, the key consideration is the basis upon which it recouped that investment, or stated otherwise, did petitioner "look *solely* to the extraction of * * * [minerals] for a return of * * * [its] capital." *Commissioner v. Southwest Expl. Co.,* 350 U.S. 308, 314. If so, then the proceeds were royalties as that term is defined in the regulations and by this Court. Sec. 1.543-1(b)(3), Income Tax Regs.; *U.S. Universal Joints Co.,* 46 B.T.A. 111, 116.

The answer to the question depends largely upon an evaluation of the particular facts involved. Moreover, as in tax matters of every sort, unless otherwise clearly provided by statute, we must

be guided by the substance of the underlying arrangement, not by its formal trappings. *Commissioner v. P.G. Lake, Inc.,* 356 U.S. 260, 266-267; *Rutledge v. United States,* 428 F. 2d 347, 352 (5th Cir.); *Royalton Stone Corp. v. Commissioner,* 379 F. 2d 298, 299 (2d Cir.), affirming a Memorandum Opinion of this Court; *Estate of Ollie G. Rose,* 56 T.C. 185, 190. And in applying these principles to the present problem, "The determination of whether an economic interest has been retained is not dependent upon the label that is given to the transaction by the parties." *Laudenslager v. Commissioner,* 305 F. 2d at 690. Thus, "[the] economic interest test is not affected by the fact that the agreement was written as a sale rather than as a mineral lease." *Hartman Tobacco Co. v. United States,* 471 F. 2d at 1329.

The substance of the arrangement between petitioner and Jamieson Co. convinces us that petitioner did retain an economic interest in its sand and gravel deposits for which reason the payments received from Jamieson Co. are royalties. Although the parties adopted the language of an outright sale in one portion of their agreement, this was nothing more than protective coloration, and was contradicted by other provisions therein. The heart of their arrangement was contained in the terms of paragraph 3, where they provided that Jamieson Co. was to pay petitioner a specified amount for each ton of rock, gravel, or sand removed. This was the only consideration for the sand and gravel. Moreover, the amount so specified was based on a sliding scale of prices per ton pegged to the average wholesale price during the month of removal. Accordingly, the agreed-upon payments to petitioner were *entirely* dependent upon Jamieson Co. removing the sand and gravel. The contract provided for no downpayment, no guaranteed minimum payment, no ceiling on payments, and no other compensation. Cf. *United States v. White,* 311 F. 2d 399 (10th Cir.); *Gowans v. Commissioner,* 246 F. 2d 448 (9th Cir.); *Don C. Day,* 54 T.C. 1417. Indeed, by tying the price of the sand and gravel to current market conditions, the agreement underscored petitioner's ongoing stake in the extraction and sale of those deposits. We can hardly imagine a clearer instance of a retained economic interest. The only real sales occurred as the gravel was severed from the land ton by ton and paid for at a price geared to current market conditions. There was no sale of the material "in place" at the time of execution of the agreement.

Our conclusion in this respect is confirmed, we think, by the language of the 1962 addendum to the contract which provided that the "purchase price" would be reduced by 20 percent in any year in which petitioner "sold" more than a million tons of rock, sand, and gravel to Jamieson Co. By its agreement to this price reduction as an incentive for Jamieson Co.'s increased production, petitioner attested to the explicitly conditional nature of its recovery of its investment. Plainly, it was the parties' understanding that their arrangement involved continuing and repeated royalty payments in respect of the sand and gravel as they were removed rather than a single, unconditional sale of the deposits "in place" to be paid for either in a lump sum or by installments.

Petitioner nonetheless argues that Jamieson Co.'s obligation under the contract to remove *all* of the deposits on petitioner's land was unconditional and enforceable in court, as a result of which petitioner would have us conclude that the payments under the contract were not dependent upon the extraction as such but were rather in the way of installments on a single purchase price which, on account of the uncertain extent of the deposits, could not be ascertained at the outset.

This interpretation of the contract, however, fails to account for the percentage-of-market price arrangement and for the agreement to grant Jamieson Co. production discounts, both of which smack of a retained economic interest by petitioner. The broader response to petitioner's position, though, is that nowhere in the contract was Jamieson Co. obligated to remove any deposits. To be sure, it was contemplated that it would remove some deposits. The contract included an estimate of available deposits, qualified, however, by a specific disclaimer of any warranty in respect thereof. But paragraph 1 spoke only of a "right" to quarry on the premises, and then only "as may be proper and profitable under good quarrying practices." Furthermore, paragraph 4 provided Jamieson Co. with an option to terminate the agreement if "at any time * * * Buyer determines that rock, gravel and sand can no longer be profitably quarried and removed from the lands." This is not the language of an unconditional obligation. Cf. *Estate of Walker v. Commissioner*, 464 F. 2d 75 (3d Cir.); *Royalton Stone Corp. v. Commissioner*, 379 F. 2d 298 (2d Cir.). Quite the contrary, by reason of this escape clause, petitioner's prospect of receiving pay-

ments was wholly dependent upon Jamieson Co. determining that market conditions were favorable. This circumstance alone, apart from other considerations, serves to distinguish this case from *Wayman A. Collins*, 56 T.C. 1074, upon which petitioner relies. Even with respect to the estimated deposits, it is clear that their actual presence or absence was immaterial insofar as Jamieson Co.'s obligation to mine them was concerned.

In this regard it appears to us that petitioner's true role in this arrangement was that of a costakeholder with Jamieson Co. in the deposits, both of whom bore the risk of a poor market and shared the gains in a favorable market. The contingent nature of petitioner's compensation resembled the situation in *Hair v. Commissioner*, 396 F. 2d 6 (9th Cir.), in which the purchaser was not obligated to remove all of the sand and gravel from the property. On that basis the Court distinguished the situation with which it had dealt in *Gowans v. Commissioner, supra* at 8-9, concluding that:

Where, as here, taxpayers [sic] only substantive return of capital is dependent upon a unit price payment for an undetermined amount of sand and gravel, *to be paid if, as, and when removed,* they have retained an economic interest. * * * [Emphasis supplied.]

See also *Alkire v. Riddell*, 397 F. 2d 779, 780 (9th Cir.).

By reason of the conditional payment arrangement here and the absence of an obligation of Jamieson Co. to remove all, or indeed any, of the sand and gravel deposits, we are fully persuaded that under the agreement petitioner looked solely to the extraction of the deposits for a return of its investment in the land. Petitioner thus retained an economic interest in the property in the form of royalty payments, the fact of which belies the existence of a sale of the deposits "in place." This conclusion in respect of the form of the transaction relieves us of the necessity of deciding whether the sand and gravel deposits could properly be deemed a capital asset in the hands of petitioner, although the answer seems fairly clear since the corporation was engaged in the business of selling sand and gravel. Cf. *Corn Products Co. v. Commissioner*, 350 U.S. 46. On account of the foregoing, we hold that petitioner's gross income from such sales was properly reported by petitioner as ordinary income and that petitioner is therefore not entitled to a refund. Accordingly, its income from gravel sales was includable in the computation of its ordinary gross income and its adjusted ordinary gross income

under section 543(b)(1) and (2). It is also includable in petitioner's personal holding company income under section 543(a)(3) unless petitioner has met the terms of the cumulative three-part exception contained therein.

To repeat, under the pertinent statutory provision of section 543(a)(3), personal holding company income means the portion of adjusted ordinary gross income which consists of, among other items,

(3) MINERAL, OIL, and GAS ROYALTIES.—The adjusted income from mineral, oil, and gas royalties; except that such adjusted income shall not be included if—

(A) such adjusted income constitutes 50 percent or more of the adjusted ordinary gross income,

(B) the personal holding company income for the taxable year (computed without regard to this paragraph, * * *) is not more than 10 percent of the ordinary gross income, and

(C) the sum of the deductions which are allowable under section 162 (relating to trade or business expenses) *other than*—

(i) deductions for compensation for personal services rendered by the shareholders, and

(ii) *deductions which are specifically allowable under sections other than section 162,*

equals or exceeds 15 percent of the adjusted ordinary gross income. [Emphasis supplied.]

The parties agree that petitioner did not in any event comply with the 10-percent test of part (B) for the taxable year ended in 1968. Furthermore, unless petitioner was entitled to include its California franchise and real property taxes in its computations under (C), it cannot avail itself of the exception for the remaining 2 years in issue. The California franchise tax is a tax levied on net income, Cal. Rev. & Tax. Code, sec. 23151 (West 1970), and is specifically deductible under section 164(a)(3) of the Code; State property taxes are specifically deductible under section 164(a)(1). Therefore neither tax may be considered for purposes of the test under section 543(a)(3)(C). Thus, regardless of whether petitioner otherwise satisfied the conditions of section 543(a)(3)(A) and (B) for the taxable years ended in 1967 and 1969, we hold that it failed to meet the requirement of part (C) in both years.

Petitioner's reliance on our decision in *McNutt-Boyce Co.,* 38 T.C. 462, affirmed 324 F. 2d 957 (5th Cir.), is misplaced inasmuch as Congress prospectively reversed the result reached in

1964. Sec. 225(c), Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 19, 80-81. See H. Rept. No. 749, 88th Cong., 1st Sess. A92. Likewise, section 543(a)(3), formerly section 543(a)(8), was amended at that time by the introduction of the language now contained in (C)(ii). Sec. 225(d), Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 19, 82. See H. Rept. No. 749, 88th Cong., 1st Sess. A95. Cf. *ibid.* at A97, with respect to similar language added to section 543(a)(4)(C). The statute is now too clear with respect to the exception to require further discussion. We therefore conclude that because the exception provided in section 543(a)(3) is not available to petitioner,[9] there is no reason not to include its adjusted income from mineral royalties in its personal holding company income, as a result of which petitioner is a personal holding company within the meaning of section 542(a) for all 3 of the years here involved and is subject to the tax imposed by section 541.

*Procedural issues. 1. Statute of limitations.*—Petitioner nonetheless maintains that collection of the deficiencies determined by the Commissioner is barred by reason of the Commissioner's disregard of two procedural requirements. The first of these alleged errors pertains to the mailing of the notice of deficiency, which, petitioner points out, occurred more than 3 years after January 16, 1970, the date on which it filed its return for the most recent of the years in issue. Petitioner concludes that the assessment and collection of the deficiencies herein is barred by section 6501(a),[10] the applicability of which to personal holding company taxes, says petitioner, is not affected by petitioner's consent to an extension of the period of limitation upon the assessment of "income and profits tax."

The short answer to petitioner's position is that the applicability of section 6501(a) is expressly subject to the other provisions of section 6501, among which is the following:

---

[9] Since we find that there has been failure of compliance with condition (C) of sec. 543(a)(3), it is unnecessary to consider petitioner's contention in respect of alleged compliance with the 10-percent requirement of condition (B) for the taxable year ended in 1969.

[10] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

(f) PERSONAL HOLDING COMPANY TAX.—If a corporation which is a personal holding company for any taxable year fails to file with its return under chapter 1 for such year a schedule setting forth—

> (1) the items of gross income and adjusted ordinary gross income, described in section 543, received by the corporation during such year, and

> (2) the names and addresses of the individuals who owned, within the meaning of section 544 (relating to rules for determining stock ownership), at any time during the last half of such year more than 50 percent in value of the outstanding capital stock of the corporation,

the personal holding company tax for such year may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return for such year was filed.

In each of the years in issue petitioner filed a standard U.S. Corporation Income Tax Return, Form 1120, unaccompanied by the schedule of specific information referred to in section 6501(f). Petitioner nevertheless contends that section 6501(f) is inapplicable because all of the information sought therein was contained in petitioner's returns, albeit not on a separate schedule. This position is simply untenable.

In the first place, nowhere did petitioner provide the Commissioner with its adjusted ordinary gross income or even all the information necessary for its computation.[11] This particular item was considered to be of sufficient importance that its specific mention was added to section 6501(f) by amendment in 1964. Revenue Act of 1964, Pub. L. 88-272, sec. 225(k)(6). Moreover, even if petitioner had reported its adjusted ordinary gross income in the same inconspicuous manner in which it included the other information pertaining to its gross income, petitioner could not be regarded as having complied with section 6501(f). Although the Supreme Court in *Commissioner v. Lane-Wells Co.*, 321 U.S. 219, was dealing with a requirement then in effect regarding the filing of a separate *return* for personal holding companies on Form 1120H notwithstanding that all pertinent information may have been reported in the regular corporate return on Form 1120, its reasoning is equally applicable here in respect of the present requirement that a separate schedule (specifically

---

[11] In computing the adjusted ordinary gross income, as defined in sec. 543(b)(2), it is necessary, in respect of mineral royalties, to subtract therefrom the amount of certain deductions "to the extent allocable * * * to such gross income from royalties." Inasmuch as petitioner received income from sources other than mineral royalties, such an allocation may have been necessary. Yet, on its return petitioner did not indicate whether such an allocation was required nor did it provide the information on which to base such an allocation.

identified in the Forms 1120 in use in the taxable years as Schedule 1120PH) be filed along with Form 1120. The Court made clear that the purpose of requiring that the pertinent information be set forth separately (321 U.S. at 223):

is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished. * * *

Not only did petitioner fail to include this information in a readily usable fashion, it effectively disguised what information was reported by failing to check the box provided on its Forms 1120 identifying itself as a personal holding company. Cf. *Mayfair Minerals, Inc.*, 56 T.C. 82, 92, affirmed 456 F. 2d 622 (5th Cir.).

Statutes which bar the collection of taxes otherwise due and unpaid are matters of congressional consent and are to be strictly construed in favor of the Government. *Lucia v. United States*, 474 F. 2d 565, 570 (5th Cir.); *McDonald v. United States*, 315 F. 2d 796, 801 (6th Cir.); *Pacific Coast Steel Co. v. McLaughlin*, 61 F. 2d 73, 75 (9th Cir.); *Loewer Realty Co. v. Anderson*, 31 F. 2d 268, 269 (2d Cir.). Petitioner has clearly failed to comply with the explicit return requirement of section 6501(f) for which reason the applicable period of limitations is 6 years. The deficiency notice herein was therefore timely mailed. *West Coast Ice Co.*, 49 T.C. 345, 350. On account of the applicability of section 6501(f), we do not reach the question raised by petitioner as to the breadth of the consent obtained by the Commissioner by reason of an executed Form 872 which covered "any Federal income and profits taxes due" under any return made by the taxpayer.

2. *Second examination.*—The second of petitioner's procedural objections concerns the alleged second audit of its returns for the taxable years ended October 31, 1967 and 1968, both of which were stamped "Closed on Survey," on account of which petitioner argues the deficiencies determined in respect of those years are void. Petitioner's authority for such a conclusion is unclear. Section 7605(b)[12] and the accompanying regulations (section

---

[12] SEC. 7605. TIME AND PLACE OF EXAMINATION.

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

301.7605-1) upon which it relies, are inapposite inasmuch as the parties have stipulated that the Commissioner conducted *only one* actual inspection of petitioner's books, and it is well settled that that section has no bearing upon the Commissioner's authority to examine tax returns already in his possession. Cf. *United States v. Dawson,* 400 F. 2d 194, 200 (2d Cir.); *Geurkink v. United States,* 354 F. 2d 629, 631 (7th Cir.); *DeMasters v. Arend,* 313 F. 2d 79, 85-86 (9th Cir.); *Robert F. Collins,* 61 T.C. 693.

Likewise, petitioner's reliance upon section 601.105(j), Proced. & Admin. Regs.,[13] is misplaced. Those regulations are intended to govern the reopening of cases which are closed *after* examination. The two returns in controversy at this point were not previously "examined" at all. They were merely checked for form, execution, mathematical accuracy, and were "surveyed" for classification. As a result of that "survey" it was determined that they would not be "examined"—i.e., that there would not be either a field audit or an office audit—and the words "Closed on Survey" were then stamped on the face of the returns to reflect such classification. See secs. 601.103(b) and 601.105(a), Proced. & Admin. Regs.[14] That "survey" or "classification" was not an

---

[13] Sec. 601.105. Examination of returns and claims for refund, credit or abatement; determination of correct tax liability.
* * *

(j) *Reopening of cases closed after examination.* (1) The Service does not reopen any case closed after examination by a district office or Office of International Operations to make an adjustment unfavorable to the taxpayer unless:

(i) There is evidence of fraud, malfeasance, collusion, concealment, or misrepresentation of a material fact; or

(ii) The prior closing involved a clearly defined substantial error based on an established Service position existing at the time of the previous examination; or

(iii) Other circumstances exist which indicate failure to reopen would be a serious administrative omission.

(2) All reopenings are approved by the Assistant Regional Commissioner (Audit), or by the Director of International Operations for cases under his jurisdiction. If an additional inspection of the taxpayer's books of account is necessary, the notice to the taxpayer required by Code section 7605(b) will be delivered to the taxpayer at the time the reexamination is begun.

[14] Sec. 601.103(b), Proced. & Admin. Regs., provides as follows:

Sec. 601.103. Summary of general tax procedure.

(b) *Examination and determination of tax liability.* After the returns are filed in the office of the district director of internal revenue or in the office of the director of a regional service center, they are sorted, classified, and processed. Many of these returns are selected for examination. If adjustments are proposed with which the taxpayer does not agree, he is ordinarily afforded certain appeal rights, including an opportunity to discuss the proposed adjustments (except mathematical errors) in a conference in the district director's office. If this conference results in agreement on the proposed adjustments, the taxpayer is requested to execute an agreement form. If the tax involved is an income, profits, estate, gift, or chapter 42 tax, and if the taxpayer waives restrictions on the assessment and collection of

"examination" within the meaning of section 601.105(j), and that this is the proper meaning to be given the word "examination" as thus used is made clear by the context in which the matter is treated in Rev. Proc. 72-40, 1972-2 C.B. 819-820, which is concerned with "agreed" and "unagreed" cases, situations that obviously contemplate the conduct of audits and conferences with the taxpayer or his representatives. There has thus been no closing of the cases after "examination" within the meaning of the regulations,[15] and therefore the reopening procedure provided for in section 601.105(j) is inapplicable. Moreover, and finally, these procedural rules are merely directory, and like other similar procedural rules "compliance with them is not essential to the validity of a notice of deficiency." *Luhring v. Glotzbach*, 304 F. 2d 560, 563 (4th Cir.). Accord, *Cleveland Trust Co. v. United States*, 421 F. 2d 475, 481-482 (6th Cir.); *Geurkink v. United States*, 354 F. 2d 629, 632 (7th Cir.); *Robert F. Collins*, 61 T.C. 693, 701; *Anthony B. Cataldo*, 60 T.C. 522, 523; *Philip F. Flynn*, 40 T.C. 770, 773.

*Decision will be entered for the respondent.*

---

the tax (see sec. 601.105(b)), the deficiency will be immediately assessed.

Similarly, sec. 601.105(a) contemplates a preliminary check on returns prior to the examination alluded to in part (j):

Sec. 601.105. Examination of returns and claims for refund, credit or abatement; determination of correct tax liability.

(a) *Processing of returns.* When the returns are filed in the office of the district director of internal revenue or the office of the director of a regional service center, they are checked first for form, execution, and mathematical accuracy. Mathematical errors are corrected and a correction notice of any such error is sent to the taxpayer. Notice and demand is made for the payment of any additional tax so resulting, or refund is made of any overpayment. Returns are classified for audit at regional service centers. Certain individual income tax returns with potential unallowable items are delivered to Audit Divisions at regional service centers for correction by correspondence. Otherwise, returns with the highest audit potential are delivered to district Audit Divisions based on workload capacities. Those most in need of examination are selected for office or field audit.

[15] Cases closed after examination are to be distinguished from cases in respect of which the taxpayer and the Commissioner have executed a closing agreement the exclusive procedure for which is set forth in sec. 7121. That section envisages an agreement knowingly entered into by both parties. *Estate of Ella T. Meyer*, 58 T.C. 69, 71; *H. M. Harrington, Sr.*, 48 T.C. 939, 953, affirmed on another issue 404 F. 2d 237 (5th Cir.). Here no such agreement was entered into nor does petitioner contend so.